MENYUK, J.T.C.
Plaintiff Yilmaz, Inc. contests a final determination of the defendant Director, Division of Taxation (the “Director”), which found *211 that plaintiff owed deficiencies of sales tax, N.J.S.A 54:32B-1 to - 29, corporation business tax, N.J.S.A 54:10A-1 to -41, and gross income tax (withholding), N.J.S.A. 54A:7-1 to -7. The principal issue is the validity of the “markup” analysis performed by the Director’s auditor in reconstructing plaintiffs income and receipts. The challenged assessments for the indicated audit periods, as stipulated to by the parties, are as follows:
[[Image here]]
Of the foregoing amounts, plaintiff had conceded that it owed sales tax that it had failed to collect from its customers with respect to certain cover charges, and has paid $3840. Plaintiff has additionally made a payment of $27,647 in sales tax, pursuant to the provisions of L. 2002, c. 6, the tax amnesty law, codified at N.J.S.A. 54:53-18.
During the tax years in issue and thereafter, plaintiff operated a restaurant and bar known as the Bridgewater Pub in Bridgeton, New Jersey. The principal issue in this case is the application of the so-called “mark on” or “markup” methodology employed by the Director to compute the gross receipts of the plaintiff. The markup method primarily affects the sales tax assessment, but the estimate of gross receipts arrived at by use of the markup method in this case has resulted in increases in the corporation business tax and gross income tax withholding assessments that are also in *212 issue. Accordingly, plaintiffs arguments are directed toward the Division’s application of the markup method.
In general terms, the markup methodology is used when the Director’s auditor deems the records of a taxpayer, whose receipts are primarily in cash, insufficient to verify the gross receipts as reported on the taxpayer’s sales tax returns and income tax returns. The auditor compares the cost of the goods sold by the taxpayer, as developed from invoices and from the records of suppliers, to the prices at which those goods are sold, as indicated on the menu and from other records maintained by the taxpayer, and computes a ratio of selling price to cost, or “markup.” For example, if the taxpayer purchased twelve bottles of beer at a cost of one dollar each, and sold each bottle for a price of two dollars, the markup would be computed as total sales of that product, or $24, divided by cost, or $12, and the markup would equal 2.0. A detailed markup analysis for the goods sold by the taxpayer is performed for a test period, in this case the calendar year 1997, and the overall markup ratio for that test period is applied to the taxpayer’s audited purchases for each year of the audit period to develop audited gross receipts subject to sales tax for each year of the audit period.
In this case, the plaintiff contends that the Director utilized unreasonable and arbitrary assumptions in the markup analysis, particularly with respect to the low percentage of sales that the Division attributed to the taxpayer’s “happy hour,” during which free food and discounted drink prices were offered. The plaintiff also asserts that the Director failed to account for the inventories it maintained. The Director contends that the plaintiffs records were wholly deficient, and that the assumptions made by the auditor were reasonable in view of the lack of records or other evidence that would support the plaintiffs contentions. For the following reasons, I reject the plaintiffs contentions and affirm the Director’s assessments.
On or about March 1, 1999, the assigned auditor contacted Yavuz Yilmaz, the sole owner of the corporate plaintiff, and advised him that he would be conducting an audit of plaintiffs *213 business. Mr. Yilmaz referred the auditor to the plaintiffs accountant, and subsequently executed a power of attorney authorizing the accountant to represent the plaintiff during the audit.
By letter dated March 1, 1999, the auditor sent the accountant a pre-audit questionnaire inquiring as to certain operational information about the business, such as seating capacity, hours of operation, number of employees, names of suppliers, whether there was a happy hour, and if so, the hours, the availability of a free buffet, and what was served at any free buffet. The questionnaire also sought information regarding the accounting systems and methods used by the taxpayer, and asked for, among other things, the names of persons responsible for preparing tax returns, the types of financial and business records maintained by the taxpayer, the number of cash registers, how cash payouts were accounted for, the names of the taxpayer’s banks and its account numbers, and the frequency and method of bank deposits. The completed questionnaire was signed by Mr. Yilmaz on June 10, 1999. It stated that the business operated seven days a week, from 11 a.m. to 1 a.m., Monday through Saturday, and from noon until 10 p.m. on Sunday. The questionnaire also disclosed that plaintiff did not maintain a general ledger, a purchase journal, guest checks or cash register tapes. The questionnaire stated that a sales journal and records for cash payouts were maintained, and that records of cash payouts were in the form of invoices. In fact, as admitted by Mr. Yilmaz at trial, he only kept invoices for cash payouts for a brief period of time, and then he threw them out.
At the accountant’s request, the audit was deferred until after April 15, 1999, the due date for many tax returns. In a letter dated May 5, 1999, the accountant requested a further deferral of the audit because Yavuz Yilmaz’ brother had the plaintiffs records that were needed by the auditor, and the brother was currently out of the country and not expected back until May 17.
The actual work of the audit commenced in mid-June 1999, when the auditor visited the accountant’s office to review the plaintiff’s records. Subsequent to that visit, the auditor sent a fax *214 to the accountant listing those additional records that he wished to review. Among other things, the auditor asked the accountant for cash register tapes, missing bank account statements for 1997, an itemization of all inter-account transfers, the details of loans to and from the plaintiff, and copies of all paid bills for 1997. It is not clear whether a similar detailed request was made verbally at the time of the auditor’s initial visit since, at the time of trial, which was five years after the audit had begun and three years after the assessment resulting from the audit had been issued, the auditor had virtually no recollection of the specifics of this particular audit except as memorialized in his audit reports, worksheets and other documents generated by him at the time of the audit. The auditor testified that he conducted twenty or so audits a year.
It is undisputed that the taxpayer did not retain cash register tapes for any portion of the audit period. It was Mr. Yilmaz’ testimony that, during the audit period, he kept cash register tapes for two or three months and then destroyed them. The plaintiff also did not use guest checks.
The accountant testified that, at some point during the audit, he offered the auditor cash register tapes for 1999, but that the auditor had rejected them. These tapes were not offered as evidence at trial and there is no suggestion that they were offered during the administrative protest of the audit determination. The auditor had no recollection of such an offer, and his workpapers did not indicate that any cash register tapes had been offered to him. The auditor testified that generally, when performing an audit, he would ask for current cash register tapes and that, if they were available, he would look at them “to get a more current picture of what was going on, if there is (sic) extenuating circumstances, what the register may be capable of, how they’re keying the information in, what detail is available.” Notably, the auditor’s July 1999 document request asked for “cash register tapes” without limiting the request solely to the period under audit.
After he was retained by the plaintiff in 1994, the accountant set up a spreadsheet program for the plaintiff, into which Mr. Yilmaz entered the sales information from the cash register tapes each *215 night after closing out the registers. The accountant testified that, at some point, the spreadsheet program had become “corrupted” in some unexplained way, and that the data regarding sales contained in the spreadsheet program was unreliable. He testified that he had realized this as early as his preparation of the 1995 corporation business tax (“CBT”) return, that he had informed Mr. Yilmaz, and that he did not rely on the computerized spreadsheet to prepare the CBT returns.
At an early point in the audit, then, it became clear that there was no record of the plaintiffs gross receipts. Plaintiff contends that the auditor “admitted” that most bar-restaurants only keep cash register tapes for a brief period of time, and that the auditor had no real expectation that he would be able to review plaintiffs cash register tapes. The auditor did indeed testify that he was not surprised that plaintiff had not retained the tapes. Whether his low expectations were developed as part of his experience in auditing similar businesses or for other reasons, his requests for the plaintiffs records were made pursuant to the requirements of the Sales and Use Tax Act. N.J.S.A. 54:32B-16 provides that records of sales be retained for examination and inspection by the Division for a period of three years from the filing of the return, or longer if required by the Director. See also, N.J.A.C. 18:24-2.3(a) (specifically requiring the retention of cash register tapes.)
That regulation previously required that such records be retained for three years, but was amended effective June 1, 1998, to require a four-year retention period. 30 N.J.R. 2070(b) (June 1, 1998). That amendment was made to conform with the four year period within which the Division is now permitted to make deficiency assessments and taxpayers are also permitted to make refund claims. 30 N.J.R. 1206(b). See, N.J.S.A 54:32B-20(a) and -27(b), as amended by L. 1992, c. 175, §§ 32-33. Where the taxpayer maintains summary records of sales, cash register tapes may be discarded ninety days from the last date of the most recent quarterly period for the filing of sales tax returns. N.J.A.C. 18:24-2.4(a). The summary records must be retained for four years. N.J.A.C. 18:24-2.4(b). Other than the inaccurate spreadsheet program, the taxpayer apparently did not maintain *216 such summary records, and no summary records were offered at trial.
The only documents retained by the taxpayer that had any bearing on the gross receipts of the plaintiff were bank account statements showing deposits into plaintiffs accounts. Those account statements evidenced greater receipts than those shown on the CBT and federal income tax returns prepared for the plaintiff by the accountant. Those income tax returns reported even greater gross receipts than the quarterly sales tax returns prepared by Mr. Yilmaz. Notably, the corporation business tax returns for tax years 1995,1996 and 1997 used by the auditor in his analysis, were not filed until May 1999, after the auditor first contacted the accountant.[2] As summarized by the auditor in his audit work papers, the disparities were as follows:
[[Image here]]
The auditor’s analysis considered bank deposits only for the audit test year, 1997, and it included adjustments for sales tax reported and paid, and loans in the amount of $83,400 and inter-company transfers in the amount of $25,039. The auditor’s analysis noted that some bank statements for 1997 were missing.
Plaintiff contended that additional adjustments should have been made by the auditor in his analysis of the bank statements. *217 Plaintiffs accountant testified that he had prepared the CBT returns from the plaintiffs bank statements, relying upon the deposits indicated on the statements for his reporting of gross receipts. He identified an analysis of the 1997 bank statements that had been prepared by him, although it is not clear whether he compiled it in connection with his preparation of the 1997 CBT return or as part of the preparation for trial. The accountant’s analysis has four columns labeled: date of deposit, cash deposit, CC deposit (which represented deposits from credit card receipts), and loans.
The accountant testified that: “I believe if you take the cash deposits and the credit card deposits, deposit the loans, and then any other adjustments that I might have made for other cash that was not received by the taxpayer, but not deposited into the account, you would come up with the [$]390,000 figure” reported on the 1997 CBT return (emphasis added). The actual number arrived at after totaling the deposits shown by the accountant, less the money he accounted for as loans, is $383,847.92. Upon further direct examination, the accountant expanded on his original testimony, stating that where he saw a debit into one account and a corresponding credit into another account, he would consider that an inter-company transfer and would not record it at all, whereas the auditor included all deposits. None of the supporting documentation used by the accountant in his analysis, such as loan documents or bank statements, were produced at trial. It is therefore unknown which of the deposits utilized by the auditor in his analysis represent what plaintiff contends are inter-company transfers. Significantly, while the accountant acknowledged the possibility that plaintiff may have received cash that was never deposited into the business accounts, his analysis of the 1997 bank statements did not show any adjustments for cash not deposited into the accounts.
The accountant also testified that, at some point, Mr. Yilmaz admitted to him that he had not reported all sales on the sales tax returns. Mr. Yilmaz himself conceded on cross-examination that he used money collected as sales tax but not reported on sales tax returns to pay for the renovation of plaintiffs business premises. *218 Subsequent to the audit, as part of a tax amnesty program, plaintiff paid $27,647, which plaintiff asserts is the sales tax that would have been due had the original sales tax returns reported the same gross receipts as had been reported on the CBT return, less the sales tax reported and paid with the original sales tax returns. See N.J.S.A. 54:53-18 for details regarding the amnesty program enacted by L. 2002, c. 6.
After determining that he would have to do a markup analysis, the auditor selected 1997 as the “test year” for which a detailed analysis of the cost of goods sold and a markup ratio would be developed and applied to other years of the audit period. The auditor testified that he had no specific recollection as to why he selected 1997, except that, based upon his review of his audit work papers, 1997 was the most recent year for which a CBT return was available,[3] and that it was probable that he would select a recent year in the audit period because more of the taxpayer’s records would generally be available.
The auditor proceeded by reviewing plaintiffs records of purchases and compared them with information from plaintiffs suppliers, where available. There was a slight difference between the purchases as evidenced by the taxpayer’s records and suppliers’ records, $185,801.85, and the audited purchases, $195,387.23, producing a ratio of reported purchases to audited purchases of 1.0516. The difference was entirely attributable to purchases of produce and cigarettes, for which the plaintiff had not retained any receipts for any of the years under audit. Mr. Yilmaz maintained that he had paid for all purchases of produce entirely in cash and that he did not retain any records of cash purchases. The auditor accepted Mr. Yilmaz’ estimate that he had spent approximately $75 to $100 weekly on produce. The plaintiff had not retained any invoices for cigarette purchases, but was eventually able to obtain a statement from its supplier.
*219 The auditor multiplied the cost of goods sold as reported on the CBT returns for 1995, 1996 and 1997 and as conveyed to him by the accountant for 1998, by the ratio of reported purchases to audited purchases to arrive at the cost of goods sold for each audit year. The auditor did not account for any inventory maintained by the plaintiff from year to year in his computation of the cost of goods sold because no inventories were reported on the CBT returns for any tax year in issue, nor did the plaintiff have any inventory records. The accountant testified that he did not include beginning or ending inventories on the CBT returns because plaintiff was a cash basis taxpayer. When asked on cross-examination how inventories should have been accounted for in determining the cost of goods sold, the accountant responded that, “you make a guess.” He conceded that there was no way of verifying the inventory on hand at the beginning and end of any of the years under audit.
There was also testimony by the accountant and Mr. Yilmaz that, during 1997, plaintiff purchased more than usual because the restaurant was expanded that year. Mr. Yilmaz also testified that, during that same year, fifteen to twenty percent of his purchases were made for another restaurant operated by his brother. Plaintiffs audited purchases for 1997 were $195,388, and for the remaining three years of the audit period ranged from $158,511 to $182,860. There was no evidence corroborating plaintiffs explanation for the relatively greater amount of 1997 purchases.
The auditor next proceeded to perform the markup analysis. Although the test year was 1997, the auditor developed his markup ratios using purchases made during a three-month period, namely, December 1998, February 1999 and March 1999. The plaintiff did not take issue with the use of purchase information for this period, and did not contend that the markup during this period was not representative. It was plaintiffs contention, however, that the Division’s use of some post-audit invoices was evidence of the Division’s arbitrary methodology. According to the plaintiff, the Division acted unreasonably in refusing to consider cash register tapes for periods subsequent to the audit period *220 as evidence of the ratio of happy hour sales to total sales where it had used purchase records outside the audit period in computing markup ratios. Because this was one of the plaintiffs principal points, the testimony and evidence regarding the use of the December 1998, February 1999 and March 1999 purchase invoices in the markup analysis is recounted in some detail here.
The Division’s audit report and conference report[4] indicated that the plaintiff had not produced complete purchase information for 1997. At trial, the plaintiff produced 1997 invoices, and asked the auditor if he had seen them before. The auditor testified that he had no specific recollection of seeing them, but based on numbering that had been placed on the documents during discovery, the auditor conceded that they had come from the Division’s file. He further testified, however, that as best as he could recall, the invoices for 1997 that he had been given by the plaintiff did not include cigarette purchases, fresh produce purchases or soda purchases. The invoices produced by the plaintiff at trial were solely for food products such as cheese, meat and fish, frozen French fried potatoes and other frozen vegetables, and items such as cooking oils. Although the accountant testified that all purchase invoices for 1997 had been given to the auditor, no invoices for soda, cigarettes and fresh produce were introduced at trial that would corroborate his testimony.
In developing his markup ratios, the auditor compared the cost of each item purchased in December 1998, February 1999 and March 1999 with a menu that was used during the same time period. The plaintiff provided information regarding portion sizes for food items. In the case of alcoholic beverages, the cost was compared with a schedule of drink prices and serving sizes prepared by the plaintiff covering the same period. The auditor estimated that approximately thirty percent of all beer sales and twenty-five percent of all liquor sales were attributable to the plaintiffs “happy hour,” during which alcoholic beverages were *221 sold at a discount. In addition to discounted drinks, certain food items were given away as part of a free food buffet during plaintiffs happy hour.
In the case of beer, the auditor computed the markup by calculating plaintiffs cost for thirty percent (the amount attributed to happy hour sales) of the audited purchases of a particular beer, and compared that with the receipts from the sale of the same quantity of beer at the lower, happy hour price. The result was the markup for that brand of beer during happy hour. The auditor also computed the markup for the seventy percent of audited purchases not attributable to the happy hour for the same brand sold at the regular price. In the example used earlier, if the plaintiff purchased 12 bottles of Brand X beer at one dollar each, and the happy hour sales price was $1.50 and the regular price was $2.00, the respective markups for that brand would be computed as follows:

Happy Hour

12 bottles multiplied by 30% = 3.6 bottles sold during happy hour
3.6 bottles multiplied by $1 = $3.60, the cost of Brand X sold at happy hour.
3.6 bottles multiplied by $1.50 = $5.40, receipts for happy hour sales of Brand X
$5.40 divided by $3.60 = 1.5, the markup ratio for happy hour sales of Brand X

Novr-Discounted Sales

12 bottles multiplied by 70% = 8.4 bottles sold at regular price
8.4 bottles multiplied by $1 = $8.40, the cost of Brand X sold at regular price
8.4 bottles multiplied by $2 = $16.80, receipts for regular sales of Brand X
$16.80 divided by $8.40 = 2.0, the markup ratio for regular sales of Brand X
After computing the markup ratios for each brand for happy hour sales and regular sales, the auditor then computed average *222 markup ratios for sales of all brands of liquor during happy hour, sales of all brands of beer during happy hour, sales of all liquor sold without a discount, and so forth. The auditor performed a similar analysis for sales of food by menu item. He then computed average markup ratios for categories of food, such as appetizers, sandwiches and entrees. The average markup ratio for each category of alcoholic beverage and food category was multiplied by the 1997 audited purchases attributed to that category, to calculate audited gross receipts before any allowances. A consequence of this methodology is that, if more beer and liquor sales are attributed to the happy hour, the gross receipts as calculated are lower because the overall markup ratio is lower.
The auditor reduced the audited gross receipts of all categories of food and beverages by ten percent as an allowance for non-receipts. He allowed an additional twenty percent reduction of the audited gross receipts attributable to entrée dishes to account for coupons and food giveaways. He reduced audited gross receipts attributable to appetizers by ten percent for giveaways and non-discounted sales of liquor by five percent for giveaways, drink specials and for liquor used in cooking. Finally, he reduced audited gross sales from soda by twenty percent for giveaways and waste.
Mr. Yilmaz and the accountant testified that Bridgeton was a depressed economic area and that it was necessary for plaintiff to offer specials and happy hour and other discounts in order to attract customers. It was Mr. Yilmaz’ testimony that “almost all” his business was done during happy hour. The auditor testified that he made the various downward adjustments to audited gross sales based on his discussions with Mr. Yilmaz and the accountant, and the documentation given to him. The plaintiff produced discount cards at trial, which Mr. Yilmaz stated that he gave to state and city employees and to hospital employees. Coupons and hand-written index cards showing lunch specials were also placed in evidence. Plaintiff additionally produced a contract for the Bridgewater Pub’s inclusion in an “entertainment book,” whereby people purchasing the book were entitled to certain discounts at the pai’ticipating restaurants. There was no evidence of how *223 many discounted meals plaintiff had sold through this program or through any of its other discount programs. The plaintiff had no records to support any dollar amount by which food and beverages were sold at a discount or given away.
After reducing the audited gross receipts by the various allowances he permitted for discounts, giveaways and specials, the auditor took the total audited gross receipts and divided them by the audited cost of goods sold to develop an overall markup ratio of 2.9644. The audited cost of goods sold for each of the audit years was multiplied by that markup ratio to determine gross sales for each year of the audit period. The auditor computed a sales tax deficiency based on the gross sales determined by the markup method, less the tax that had already been reported and paid. Using the gross sales determined from his markup analysis, he also re-computed the plaintiffs corporation business tax for 1995, 1996 and 1997 and computed the tax for 1998 since no return had been filed for that year, and made assessments for all of the audit years.
In examining the plaintiffs gross income tax withholding returns and reports, the auditor could not reconcile them with the wages reported on the CBT returns. He concluded that the payroll, as reported, was insufficient to support the audited gross receipts. He therefore computed the ratio of reported salaries and wages to reported sales for each of the years of the audit as a percentage, and applied that percentage to the audited gross receipts to determine adjusted employee wages.
The plaintiff produced no evidence to support either the wages reported on the gross income tax withholding returns or on its CBT returns. There was general testimony by Mr. Yilmaz that, except for one or two employees who were salaried, the remainder were paid minimum wage plus tips. Moreover, the number of people employed during any particular year of the audit period was never stated with any certainty. The pre-audit questionnaire listed eleven employees, including Mr. Yilmaz.
There had been no salary or wages reported for Mr. Yilmaz, except in 1995, when a salary of $8,000 was reported. The auditor *224 estimated a salary for Mr. Yilmaz based on a fifty hour work week at ten dollars an hour, or $26,000 per year. Based on the adjusted employee wages and the estimated salary attributed to Mr. Yil-maz, the auditor made an assessment of additional gross income tax (withholding).
There was some testimony by the accountant that a “management fee” reported on the CBT returns for some years was actually a salary paid to Mr. Yilmaz. The amounts reported on the CBT returns as management fees, which ranged from approximately $21,000 per year to approximately $26,000 per year, differed by only a few thousand dollars from the $26,000 per year estimated as Mr. Yilmaz’ salary by the auditor. The accountant testified that all amounts reported as management fees were from checks actually made out to Mr. Yilmaz. Apart from that testimony, there was absolutely no evidence introduced by the plaintiff as to the salaries or wages paid to either Mr. Yilmaz or plaintiffs employees, either by way of checks or any other documentation.
The wages for each year, as set forth on the W-2 forms, on the CBT returns, and as adjusted by the auditor are as follows, with the adjustment by the auditor shown for employees only and as a total, including the salary imputed to Mr. Yilmaz:
[[Image here]]
By letter dated July 19, 2001, the auditor sent revised workpa-pers to the accountant, including a post audit conference report. The auditor’s covering letter directed the accountant to return the report if there were any issues in the workpapers that the accountant or Mr. Yilmaz wished to discuss. No response was *225 received, and on August 21, 2001, the Director issued a notice of assessment related to the final audit determination.
The plaintiff timely protested the assessment to the Division of Taxation. N.J.S.A 54:49-19. At the conference hearing, the conferee reviewed cost analyses of various menu items that had been prepared by the plaintiff, and rejected them. Although the document showed plaintiffs computation of profit margin, which was explained to some extent at trial, there was no explanation as to how the cost components of the various menu items had been arrived at. The conferee rejected the plaintiffs analyses because of discrepancies between the components of a menu item as analyzed by the plaintiff, and the description of those same items on the menu. The conferee re-allocated all purchases of chicken tenders to a menu item described as a chicken tender/pitcher of beer combination, and moved that item out of the appetizer category, and put it into a separate category. Because the markup on that item was relatively low, the effect of the adjustment was to increase the overall markup ratio for the appetizer category. The conferee also slightly increased the markup ratio for hamburgers, cheeseburgers and cheeseburgers deluxe, based on menu cost matched with invoice cost for the same period. Finally, the conferee allocated ten percent of food purchases (excluding produce purchases) to supplies. As recomputed by the conferee, the overall markup ratio was 2.8388, rather than the 2.9644 computed by the auditor, resulting in a reduction in the assessment of sales tax from $65,679.73 to $61,795.75 (both without interest and penalties).
The conferee additionally disallowed “truck expenses” claimed on the CBT returns that had been accepted by the auditor. According to the conferee, the plaintiff failed to present any documentation of those expenses. No documentation was presented at trial either. According to the accountant, Mr. Yilmaz would tell him the number of miles that he had put on the truck, the accountant would put that number in the spreadsheet, and the spreadsheet program would calculate the appropriate expense deduction. Mr. Yilmaz testified that he used the truck once a week and that he knew how many miles he traveled. For 1995 *226 and 1996, the disallowed truck expenses were about $2000 and for 1997, the truck expense was about $4000. Overall, the CBT assessment was reduced from approximately $89,000 to $21,934. The reduction presumably took into account the reduction in audited gross receipts as adjusted by the conferee.
The conferee sustained the remaining findings of the auditor and issued a final determination on December 2, 2002. It is that final determination that is appealed here.
The plaintiff’s primary contention is that the Director arbitrarily assigned too low a percentage to happy hour sales. In addition to the testimony of Mr. Yilmaz and the accountant, as evidence of this contention, the plaintiff proffered at trial certain workpapers produced by another Division auditor for a period subsequent to the audit period in issue here. Plaintiff has appended these documents to its post-trial submissions and again offered them as evidence of the appropriate markup ratios, which it asserts should have been used by the auditor for the audit period in issue here.
As noted above, the documents appear to be workpapers and not a final audit determination. Moreover, the workpapers do not appear to be a complete set of workpapers, but solely the portion showing the auditor’s markup analysis. The test year of the audit appears to be 2001, but the period covered by the subsequent audit is unknown, as is whether or not the subsequent audit has been completed. The document indicates that the auditor has calculated a markup ratio of 2.32, and has attributed approximately two-thirds of the beer and liquor sales to the plaintiffs happy hour.
The Director’s objection to this document at trial was sustained on the ground that it was not evidence of a habit, as initially contended by plaintiff, and also on the ground that it was not relevant to the audit years in issue. The Director has now moved to exclude the post-trial submission of the workpapers.
Each audit period stands on its own, and a taxpayer cannot establish that an earlier audit was erroneous by contending that a later audit was correct. Without even considering issues of hear *227 say, N.J.R.E. 802, and authentication, N.J.R.E. 901, the reliability of the findings of the subsequent audit (even if what had been offered was the complete and final set of work papers) could be determined only after evidence was presented as to the reliability of the records maintained by the taxpayer during the later period as well as the methodology employed by the Division. In other words, there would have to be a full trial as to both audit periods. Significantly, plaintiffs proffer did not include testimony by the auditor who had produced the workpapers, but there was testimony by the accountant to the effect that plaintiff had begun to maintain better records of sales and cash expenditures at some point after the audit in this case had begun.
The result of a subsequent audit under unknown conditions has no bearing on the issue of whether the audit in issue here was conducted unreasonably. Only relevant evidence is admissible. N.J.R.E. 402. “Relevant evidence is ‘evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action.’ Evid.R. 401____ Stated otherwise, relevant evidence has probative value, which is the tendency of the evidence to establish the proposition that it is offered to prove.” State v. Wilson, 135 N.J. 4, 13, 637 A.2d 1237 (1994). Nothing about the document proffered by the plaintiff would have any tendency to prove anything about the audit in issue here. The auditor’s workpapers for a subsequent period are therefore excluded as irrelevant.
I find the following facts:
1. No cash register tapes for any relevant time period were offered to the auditor. I find that the auditor’s workpapers, which note that no cash register tapes were available, and his document request, which has his handwritten notation next to the item “cash register tapes” that “none” were produced, to be more credible than the accountant’s uncorroborated assertion that he had offered the 1999 tapes to the auditor and that they had been rejected. The pre-audit questionnaire completed and signed by Mr. Yilmaz in June 1999 stated that no cash register tapes were available and no tapes were produced at trial.
*228 Significantly, it is plaintiffs principal contention that it was unreasonable for the auditor to have used invoices from December 1998, February 1999 and March 1999 in its markup analysis, when the auditor refused to examine “current” cash register tapes. The auditor notified plaintiff in March 1999 that an audit was to commence, and based on Mr. Yilmaz’ testimony that he kept cash register tapes for two or three months and then discarded them, at that point in time he should have had tapes for at least some of the same months covered by the invoices.
It is conceivable that the accountant offered cash register tapes produced later in 1999, subsequent to the commencement of the audit. Those tapes, however, were never produced at trial. It is simply not credible that, by the end of 1999, neither plaintiff nor his accountant understood the importance of retaining those tapes, if they existed.
2. Pursuant to N.J.S.A. 54:32B-16, and N.J.A.C. 18:24-2.3(a) and -2.4(b), the plaintiff should still have had in its possession the cash register tapes or summary records for tax year 1997, the so-called “test period,” at the commencement of the audit in 1999. It is true that, based upon his past experience auditing similar businesses, the auditor had no real expectation that the plaintiff would have cash register tapes available for examination, but the auditor’s expectations are immaterial. It is clear that the relevant statutes and regulations required that plaintiffs records be retained for three or four years, depending on the particular audit year. See Alpha I, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 53, 57 (2000) (where taxpayer destroys records before expiration of four year statute of limitations, it places itself in jeopardy for additional assessments of tax).
3. Notwithstanding that the auditor could not specifically recall which documents he had requested and which documents he had received, the audit report’s lists of documents that were provided and those that were not given to him were generally accurate. The plaintiff produced the 1997 purchase invoices for the purpose of demonstrating that the audit report was inaccurate. The auditor’s report merely stated, however, that “complete” purchase invoices were not provided, which was demonstrably the case for *229 the 1997 invoices in evidence. As conceded by the auditor, the 1997 bank statements were omitted from the list of the records that had been produced. He testified that this was probably because the set of statements was incomplete, as corroborated by his analysis of bank deposits, which also showed missing 1997 bank statements. No bank statements were produced at trial.
4. Plaintiff’s accountant’s analysis of bank deposits is unreliable and is not probative of plaintiffs gross receipts. He testified that he did not record what he regarded as inter-account transfers, but there was no testimony or other evidence as to the amounts of those transfers or the rationale for so categorizing those amounts, other than his testimony that where there was a debit from one account and a credit to another on the same date in the same amount, he excluded it from his analysis. On cross-examination, the accountant testified that he had records of the inter-account transfers but did not bring them to trial. There was also no supporting documentation for loan monies paid into the accounts. Finally, although the accountant acknowledged the possibility that not all cash receipts made their way into the bank accounts, there was no evident adjustment made to his analysis to account for such cash.
5. Bridgeton is an economically depressed area and the plaintiff offers discounts and specials to bring in business. However, there is no record of the sales which were discounted or were sold at a special price or were given away as part of the happy hour buffet.
6. The wages subject to gross income tax withholding had been understated by the plaintiff. Although there was testimony that the hours of operation changed during the audit period, the two menus in evidence covering the years 1996 through 2000 both state that all menu items are available from 11 a.m. to 1 a.m., Monday through Sunday, or 98 hours a week. The pre-audit questionnaire indicates that Sunday hours are 12 noon to 10 p.m., and from 11 a.m. to 1 a.m., Monday through Saturday, or 94 hours a week. For 1998, when wages of $62,224 were reported for purposes of gross income tax withholding (excluding any payments to Mr. Yilmaz), and assuming that the Bridgewater Pub operated *230 94 hours a week, or 4888 hours a year, the wages paid per hour of operation would have amounted to $12 or $13 dollars an hour. Mr. Yilmaz conceded that, in addition to himself, he has two fulltime bartenders, one of whom is salaried, and that there is generally a waitress. When it is busy, he has several more employees. A total wage payout of $13 per hour for all employees appears very unrealistic. As noted in a California audit procedure manual relied on by the plaintiff, and discussed in more detail below, in determining the reasonableness of audit results when the markup method is used, consideration should be given to employees working “off the books.”
At issue here is the reasonableness of the methods employed by the Director for an audit period where plaintiff had virtually no records of its receipts. The Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29, squarely places on the vendor the obligation of establishing that it correctly reports its collections of tax. First, the statute presumes that all receipts from the sales of tangible personal property, of enumerated services, and of food and drink in restaurants, as set forth in N.J.S.A. 54:32B-3(a), (b) and (e), “are subject to tax until the contrary is established, and the burden of proving that any such receipt ... is not taxable hereunder shall be upon the person required to collect tax or the customer.” N.J.S.A. 54:32B-12(b). Plaintiff here is a “person required to collect the tax.” N.J.S.A. 54:32B-2(w).
Second, as noted above, the statute mandates that persons required to collect the tax maintain records of both purchases and sales for inspection and examination by the Director. N.J.S.A 54:32B-16. Where the sales tax return is incorrect or insufficient, the Director is given broad authority to determine the tax from any information that may be available. N.J.S.A 54:32B-19. The Director is also authorized to “prescribe methods for determining the amount of receipt ... and for determining which of them are taxable and which are nontaxable.” N.J.S.A 54:32B-24(4).
That the vendor is required to demonstrate by way of adequate records that it has correctly reported the tax when called on to do so by the Director’s auditor is a sensible effectua *231 tion of a statutory scheme in which the vendor collects the tax from its customers, and holds it in trust until it is reported and turned over to the State. See N.J.S.A. 54:32B-12(a) (“The tax shall be paid to the person required to collect it as trustee for and on account of the State.”). This is not a tax imposed on the vendor but on the vendor’s customer, and as such is what is commonly called a “trust fund” tax.[5] Cooperstein v. State, Div. of Taxation, 13 N.J.Tax 68, 78 n. 4 (1993), aff'd, 14 N.J.Tax 192 (App.Div.1994), certif. denied, 140 N.J. 329, 658 A.2d 728 (1995). Plainly, the Legislature did not intend that a vendor collect the tax and convert it to its own use or utilize tax monies as a loan to the business.
Moreover, it is well settled that the Director’s assessment is presumed to be correct. Atlantic City Transp. Co. v. Director, Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953) (quoting Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)); L & L Oil Service, Inc. v. Director, Div. of Taxation, 340 N.J.Super. 173, 183, 773 A.2d 1220 (App.Div.2001); Meadowlands Basketball Associates v. Director, Div. of Taxation, 19 N.J.Tax 85, 90 (2000), aff'd, 340 N.J.Super. 76, 773 A.2d 1160 (App.Div.2001); Neuman v. Director, Div. of Taxation, 14 N.J.Tax 313, 318 (1994), aff'd, 15 N.J.Tax 228 (App.Div.1995); Ridolfi v. Director, Div. of Taxation, 1 N.J.Tax 198, 202-03 (1980). The plaintiff has the burden of proving the contrary. Atlantic City Transp. Co., supra, 12 N.J. at 146, 95 A.2d 895; Seventeen Thirty Corp. v. Director, Div. of Taxation, 18 N.J.Tax 168, 179 (1999); Newman, supra, 14 N.J.Tax at 318. The “naked asser tions” of the taxpayer, without supporting records or documentation, are insufficient to rebut the presumption that the Director’s assessment is correct. TAS Lakewood, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 131, 140 (2000); Ridolfi, supra, 1 N.J.Tax at 202-03; see also Atlantic City Transp. Co., supra, 12 N.J. at 146, 95 A.2d 895 (the taxpayer did not overcome the presumption that the Director’s assessment was correct where it produced no *232 evidence to support its claim that it did not operate its lines over a public street).
In Ridolfi v. Director, Div. of Taxation, supra, 1 N.J.Tax 198, the Director had made an adjustment and a redetermination of the tax due on sales of alcoholic beverages from the taxpayer’s package store. Among other things, the taxpayer contended that a greater percentage of the package store’s volume of sales were sales of beer (which was nontaxable) than was reflected by the Division’s allocation. The court noted that:
Taxpayer relied on his long experience in the operation of this business to support his contention that 65% of the package store sales were beer. No documentary evidence or records were presented to support any of the taxpayer’s contentions. No attempt was made to introduce evidence or figures of any alternate test periods, or to show relative sales volumes of beer and liquor over the bar and in the package store for any period. None of the invoices or other business records of the taxpayer which were available at the time of the audit were relied upon by taxpayer to support his contentions.
[Id. at 201.]
The court concluded that the naked assertions of the taxpayer were not competent evidence sufficient to rebut the presumption that the Director’s assessment was correct. Id. at 203.
See also the Tax Court decision in TAS Lakewood, Inc. v. Director, Div. of Taxation, supra, 19 N.J.Tax at 132-33, where the Director’s assessment of a sales tax deficiency arose out of a discrepancy between the gross receipts reported on the taxpayer’s federal income tax return and those reported on its New Jersey sales tax return. The taxpayer contended that the disparity was due to sales it made in New York and not in New Jersey. The taxpayer’s New York State income tax return reported that the taxpayer had made about twenty percent of its sales in New York and the Director assessed sales tax on all of the taxpayer’s sales, except those sales made in New York, as reported on the New York return. At trial, the taxpayer contended that its sales made outside New Jersey were actually greater than twenty percent, but could produce no records, since it had disposed of all of them in a trash dumpster. The only proof offered in support of the claim was the uncorroborated testimony of the taxpayer’s vice president. That there was nothing presented at trial “to corroborate any claim or figure presented by [the corporate officer] *233 makes his testimony highly suspect.” Id. at 138. The court was not persuaded by the testimony and affirmed the assessment.
That the accountant’s testimony here corroborated the testimony of Mr. Yilmaz does not overcome the presumption that the Director’s assessment was correct. The pretrial order named the accountant as a potential expert witness, but the accountant was never offered or qualified as an expert witness pursuant to N.J.R.E. 702, which requires a finding that the witness have the requisite knowledge, skill, experience, training, or education to be an expert in an area of specialized knowledge. The accountant is not a certified public accountant and his principal job function is to prepare tax returns. He testified that he does not express opinions as to whether a company is properly reporting its tax liabilities.
Although the plaintiff characterized the accountant as an unbiased, impartial witness, I conclude that his role was as an advocate for the plaintiffs position, and by inference, his own actions. At a minimum, his competence in connection with his preparation of the CBT returns was in issue. His professional reputation was at stake. I find that his factual testimony was unsupported and not credible. Cumulative naked assertions are insufficient to overcome the presumption of the correctness of the Director’s assessments.
It is not entirely clear what proof is necessary to overcome that presumption in cases involving the Director’s methods in an audit of a cash business. Although it involves a different type of assessment, it is helpful to examine how the courts of this State have viewed the presumption of correctness in local property tax appeals. Notably, our Supreme Court looked to local property tax case law in declaring that the Director’s assessment is presumed to be correct. See Atlantic City Transp. Co, supra, 12 N.J. at 146, 95 A.2d 895 (quoting Aetna Life Insurance Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)). In local property taxation, the presumption of correctness attaches to the quantum of the assessment, and the presumption can be rebutted only by cogent evidence that must be “definite, positive and certain in *234 quality and quantity to overcome the presumption.” Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (quoting Aetna Life Ins. Co. v. City of Newark supra, 10 N.J. at 105, 89 A.2d 385). Although neither Ridolfi nor TAS Lakewood explicitly incorporate that standard, their rejection of the testimonial evidence of owners and officers unsupported by anything else implicitly recognizes that the taxpayer cannot overcome the presumption simply by impugning the Director’s methodology. See Pantasote Co., supra, 100 N.J. at 414-15, 495 A.2d 1308 (“[Ajbsent any strong indication arising from the evidence properly before the Tax Court that the quantum of the assessment was far’ wide of the mark of true value, inadequacies in the municipality’s evidence or deficiencies in the assessment methodology will not impugn the presumption of validity that attaches to the original assessment.”).
Plaintiff relies upon Duncan Truck Stop, Inc. v. Director, Div. of Taxation, 4 N.J.Tax 367, 375-76 (1982), for the proposition that the Director must use the most reasonable means available to independently verify the plaintiffs tax liability. Duncan involved an assessment of a motor fuel tax deficiency where the original records had been destroyed, but had been reconstructed by the taxpayer. The Division observed a large disparity between the sales reported on the reconstructed records and on records it had obtained from eleven out of approximately thirty of the taxpayer’s customers that had been observed by the Division. The reconstructed records reported only twenty-percent of the sales shown on the records of the eleven customers. The Division determined the deficiency by applying that ratio to the reported sales. The court held that the Director was entitled to use the reconstructed records to commence his investigation of the taxpayer, notwithstanding the testimony of the principal of the plaintiff that the reconstructed records were inaccurate. The court ultimately found, however, that there was nothing to support the proposition that the sampling of eleven out of thirty customers used by the Division to compute the deficiency was an accurate representation of the sales made by the taxpayer. The accuracy of the assessment was further called into question by additional evidence that *235 the taxpayer’s facility could not possibly pump the amount of gas that the Director had estimated.
Contrary to the facts of the present case, there was evidence that was definite, positive and certain in quality and quantity. Notably, Duncan Truck Stop, supra 4 N.J.Tax at 376, approved the sampling procedure used in Ridolfi, supra, 1 N.J.Tax 198.
I conclude that there is no merit to the assertion that the Director should be required to establish that it used the most reasonable means available to independently verify the plaintiff’s tax liability. As already noted, the Director is given wide latitude to establish the tax due from such information as may be available and if necessary the tax may be estimated from external indices. N.J.S.A. 54:32B-19. That does not mean that the Director must seek out any information that may be available anywhere. It is the taxpayer’s statutory obligation to maintain records and make them available to the Director. N.J.S.A. 54:32B-16. As noted in Ridolfi, supra, 1 N.J.Tax at 203, the absence of specific sales information from the taxpayer makes the use of external indices necessary.
In Ocean Pines, Ltd. v. Point Pleasant Bor., 112 N.J. 1, 547 A.2d 691 (1988), our Supreme Court held that, where a taxpayer has failed to comply with a statute that requires the taxpayer to provide financial information to a taxing authority, the taxpayer’s appeal “is limited in its scope to the reasonableness of the valuation ‘based on the data available to the assessor.’ ” Id. at 11, 547 A.2d 691. To hold otherwise would be contrary to the purpose of the statute, which is to assist the assessor in making the assessment and “‘to avoid the unnecessary expense, time and effort in litigation’ ” Id. at 7, 547 A.2d 691 (quoting Terrace View Gardens v. Dover Tp., 5 N.J.Tax 469, 474-75 (1982), aff'd o.b., 5 N.J.Tax 475 (App.Div.), certif. denied 94 N.J. 559, 468 A.2d 205 (1983)). The same logic applies here: it is contrary to the purpose of N.J.S.A 54:32B-16 to require the Director to establish that he used the best possible method to estimate the taxpayer’s receipts, where it is the taxpayer’s failure to comply with the statute that *236 forced the Director to resort to the markup method in the first place.
Although many eases challenging determinations of the Director turn on the appropriate administrative construction given to a statute, as to which the burden of proof applicable in local property tax cases is inappropriate, I conclude that, in a case involving a challenge to a determination by the Director based on an audit of a cash business, involving only factual issues and the methods employed by the Director, the standard set forth in Pantasote Co., supra, 100 N.J. at 413, 495 A.2d 1308, is a reasonable and practical one. That is, the presumption that the Director’s assessment is correct can be rebutted only by cogent evidence that must be “definite, positive and certain in quality and quantity to overcome the presumption.” Ibid. That evidence must focus on the reasonableness of the underlying data used by the Director and the reasonableness of the methodology used. Ocean Pines Ltd., supra, 112 N.J. at 11, 547 A.2d 691. An “aberrant” methodology will overcome the presumption of correctness. Id. at 12, 547 A.2d 691. An imperfect methodology will not.
Plaintiff has cited administrative decisions from other states in support of various points of its argument. They are not helpful because the facts of the cases disclose either that the taxpayer maintained better records or that the methodology of the taxing authority was aberrant or both.
Judicial decisions from other jurisdictions, however, hold the taxpayer to substantially the same standard as New Jersey. The courts of this state have often noted that the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29, is derived from the New York statute. Meadowlands Basketball Associates, supra, 340 N.J.Super. at 83, 773 A.2d 1160; New Jersey Bell Tel. Co. v. Director, Div. of Taxation, 152 N.J.Super. 442, 450, 378 A.2d 38 (App.Div.1977); Seventeen Thirty Corp., supra, 18 N.J.Tax at 182-83. Although the decisions of the New York courts ai'e not controlling, they are instructive. Meadowlands Basketball Associates, supra, 340 N.J.Super. at 83, 773 A.2d 1160; Seventeen Thirty Corp., supra, 18 N.J.Tax at 183,
*237 The New York Court of Appeals, that state’s highest court, has rejected contentions that the taxing authority did not allow a sufficient margin for employee purchases, theft, waste and “loss leaders” where there was no direct proof of the losses and there was no expert testimony establishing the extent of such losses generally occurring in the industry. Licata v. Chu, 64 N.Y.2d 873, 487 N.Y.2d 552, 476 N.E.2d 997 (1985). In S.H.B. Super Markets, Inc. v. Chu, 135 A.D.2d 1048, 522 N.Y.S.2d 985 (1987), the taxpayer contended that the auditor’s allocation of taxable and nontaxable sales was erroneous. The cash register tapes maintained by the taxpayer in that case did not separately state taxable and nontaxable sales. “‘[Wjhere the taxpayer’s own failure to maintain proper records prevents exactness in determination of sales tax liability, exactness in not required.’ ” Id. at 987 (quoting Meyer v. State Tax Comm’n, 61 A.D.2d 223, 402 N.Y.2d 74, 78 (1978)). Oak Beach Inn Corp. v. Wexler, 158 A.D.2d 785, 551 N.Y.S.2d 375 (1990), upheld an audit assessment where the taxpayer “failed to submit concrete evidence as to what part, if any, of the unaccounted for wine inventory was purchased during the test period____” Id. at 377.
Similarly, in a case challenging the outcome of an audit using the markup method, the Tennessee Supreme Court has held:
Vague allegations by the taxpayer to the effect that the Department’s method of ascertaining the taxes due from him was incorrect are not sufficient to carry the taxpayer’s burden. He must show by a preponderance of evidence that he not only has overpaid his taxes, but, also, the amount of such overpayment.
[Edmonson Mgmt. Serv., Inc. v. Woods, 603 S.W.2d 716, 718 (Tenn.1980) (citing Baker v. Bullock, 529 S.W.2d 279 (Tex.Civ.App.1975)).]
I conclude that the plaintiff has not met its burden here. It has attacked the Director’s methodology, but has offered nothing that would demonstrate that the Director’s assessment of sales tax is incorrect. Under the circumstances of this audit, I conclude that the auditor reasonably determined to use the markup method. See N.J.S.A. 54:32B-19, which provides, in pertinent part, that:
If a [sales tax] return ... when filed is incorrect or insufficient, the amount of tax due shall be determined by the director from such information as may be available. If necessary, the tax may be estimated on the basis of external indices, such as stock on hand, purchases, ... number of employees or other factors.
*238 See also N.J.A.C. 18:24-2.15, which provides that records may be deemed incorrect or insufficient where the taxpayer’s accounting system does not have adequate internal control procedures that assure the accuracy and completeness of the transactions recorded in the books and records. In this case, the disparity in the gross receipts reported on the CBT and sales tax returns was sufficient to warrant use of the markup analysis for determining the gross receipts.
I also conclude that the auditor gave reasonable consideration to plaintiffs contentions that it gave away food and that many of its sales were discounted. In the absence of any documentation by the plaintiff as to the amounts involved, the auditor’s application of discounts in amounts less than claimed by the plaintiff was reasonable. The auditor gave the benefit of the doubt to the plaintiff in several other instances, where that indulgence went beyond what was warranted by the facts of this case. For example, he accepted the plaintiffs estimate of cash expenditures for produce, where the plaintiff had not kept any receipts or invoices. He also accepted the plaintiffs estimate of cover charges collected by it, as to which there were no records.
The auditor’s determination to use invoices from a period later than the audit to determine the markup percentages was also reasonable, when there was not a complete set of invoices from 1997. There was no contention that the markups for that particular period of time were not representative of the entire audit period. The only assertion was that the use of those invoices was unreasonable in view of the alleged refusal of the auditor to look at 1999 cash register tapes. As I have already found, the testimony regarding that offer was not credible.
None of plaintiffs remaining contentions were supported by any documentation. The Director was not required to guess as to the amount of inventory maintained by the plaintiff in each of the audit years, particularly where even plaintiffs accountant admitted that the inventory was impossible to reconstruct at this late date. In sum, there was no evidence that was definite, positive and certain in quality and quantity sufficient to overcome the *239 presumption that the Director’s assessment of sales tax is correct. The data used by the Director was reasonable in light of what was available, as was the methology employed.
I also conclude that the adjustments to the deficiencies of corporation business tax were reasonably arrived at. The adjustments for gross receipts were made consistent with the findings of the markup analysis. Although plaintiff contends that there is no requirement that it maintain a log or other evidence of its truck expenses, the statute does in fact require retention of records used by a taxpayer to determine its liability. N.J.S.A. 54:10A-14.1.
As I found earlier in this opinion, plaintiff understated wages for the purpose of gross income tax withholding. See N.J.S.A. 54:7 — 1(a). In the absence of any evidence that the amount of the assessment was “far wide of the mark,” Pantasote, supra, 100 N.J. at 414-15, 495 A.2d 1308, an attack on the Director’s methodology is insufficient to overcome the burden of the presumption that the assessment is correct. Ibid.
Finally, I must consider the Director’s motion to exclude certain other documents appended to plaintiffs brief, which the Director has objected to and moved to exclude. The first concerns the issue of whether the Director used the correct number of ounces in a half keg of beer to compute the cost of a pitcher in the markup analysis. Plaintiff appended to its brief a document entitled “A Dictionary of Units of Measurement,” apparently taken from the Internet, but with no authentication. The Director has moved to exclude this evidence based on its hearsay nature and the lack of authentication.
During the trial, the conferee, but not the auditor, was questioned as to his determination that the plaintiffs proposed markup for a chicken tender and pitcher of beer combo, which used a $2.20 cost for a sixty-four ounce pitcher of beer, was inaccurate. According to the conferee’s calculations, the cost of a sixty-four ounce pitcher was $1.50. The conferee stated that he believed that he used 1980 ounces in a half keg of beer to determine how many pitchers of beer could be drawn from a half keg. Plaintiff *240 contends in its post trial brief that the auditor incorrectly doubled the number of ounces in a half keg. Based on plaintiffs document, a keg contains 1984 ounces and a half-keg would presumably be half of that, or 992 ounces.
I note first that this issue was never raised in the pretrial order, which specifically provided that if an issue was not preserved in the pretrial order, it was waived. The issue was also not raised at trial. No evidence was presented as to the number of ounces in a half-keg, and plaintiff concedes that the authorities it has consulted are not uniform. Accordingly, this does not appear to be information of which I may take judicial notice. N.J.R.E. 201(b). This is also not a case where the pleadings and pretrial order may be amended to conform with the evidence. R. 4:9-2. “Although ... claims of a party may be deemed amended to conform to the proofs at a trial, such amendment should be at the behest of a party and should be granted only if there is a full hearing where the evidence and arguments for and against the issue may be considered.” Essex County Adjuster v. Brookes, 198 N.J.Super. 109, 114, 486 A.2d 875 (App.Div.1984). In that case, as here, the issue was not contained in the pleadings or pretrial order, and was not discussed at trial.
■ Plaintiff is plainly trying to cast doubt upon the entire markup analysis by the auditor, but the auditor was never asked and did not testify to the number of ounces in a half-keg that he employed in his computation of costs. Plaintiffs questions were directed solely at the conferee. Based on the plaintiffs letter protesting the assessment and the conferee’s conference report and final determination, it appears that, if the conferee understated the cost of a sixty-four ounce pitcher of beer, he did so solely in rejecting the plaintiffs contention that the auditor had attributed too high a markup to the chicken tender and pitcher of beer combination special.
I conclude that the effect of the cost of beer as a component of a single special on the overall markup ratio as adjusted by the conferee was negligible. Although it is true that the conferee’s adjustment to that special had the effect of increasing the markup *241 ratio for the category of food appetizers, that was a result of allocating all of the chicken tender purchases to the chicken tender/piteher of beer combination rather than allocating a portion of the purchased chicken tenders to the chicken tender appetizer, as the auditor had done. The conferee utilized the chicken tender/piteher of beer special as a separate markup category rather than including it in the appetizer category. Because of the special’s relatively lower price, the reallocation had the effect of increasing the markup ratio for the remaining appetizers. The overall effect of the conferee’s adjustments was to reduce the auditor’s markup ratio. The Director’s motion to exclude post-trial evidence of the number of ounces of beer in a half-keg is granted, but I also conclude that the argument made by the plaintiff based on that document has no merit.
The Director also moves to exclude another post-trial exhibit, which is a document identified in plaintiffs brief as a reworking by plaintiffs counsel of the conferee’s audited gross sales calculations. The “reworking” purports to substitute for the markup used by the conferee, a markup which “comport[s] more closely with the Taxpayer’s actual experience (i.e., allocating 70% of sales to happy hour).” As noted above, as a matter of arithmetic, it is undeniable that the lower the markup that is applied to the cost of goods sold, the lower the gross sales that will be found. As such, I conclude that the calculation performed by plaintiffs counsel is a form of legal argument. Accordingly, the Director’s motion with respect to that exhibit is denied.
Finally, the Director moves to exclude exhibits to the plaintiffs post-trial brief that consist of audit procedure manuals purportedly issued by other states and obtained by plaintiffs counsel from the Internet. The Director’s objection is that the documents have not been authenticated. N.J.R.E. 902(e) provides, however, that books, pamphlets or other publications purporting to be issued by a public authority do not require extrinsic evidence of authenticity. The Director’s motion to exclude these documents is, therefore, denied.
*242 Plaintiff contends that agency guidelines are entitled to great deference, although it concedes that they are not binding on a court. The guidelines of another state’s administrative agency, however, do not constitute legal authority in New Jersey. At best, such documents may be persuasive if based on similar statutory provisions.
The more significant difficulty with those documents is that they do not help the plaintiffs cause. Both the Texas and the California manuals relied upon by the plaintiff accept the validity of the markup method where records are inadequate. With respect to the Texas manual, plaintiff emphasizes that it calls for a determination as to inventory prices and for adjustments to be made for merchandise withdrawn from inventory. The manual does not explain how the auditor is to do that if no information as to inventory has been retained by the taxpayer. Presumably, Texas does not accept the taxpayer’s best guess.
Plaintiff relies on the California manual for the proposition that the auditor must take into account happy hour and other specials. The auditor has done so in this case. He made significant allowances for giveaways and alcoholic beverages sold at happy hour. The taxpayer simply disagrees with the degree to which those allowances were made, without any evidence that its own estimate was correct. The law in New Jersey is that the naked assertions of the taxpayer are insufficient to overcome the presumption that the Director’s assessment is correct.
The plaintiff also contends that California requires a “reasonableness” test where the markup analysis concludes that there are unreported sales during the audit period. According to plaintiff, a consideration of the reasonableness of the assessment here should have included an examination of Mr. Yilmaz’ lifestyle. First, the law of this state squarely places on the taxpayer the burden of establishing that the Director’s assessment is incorrect, and not the other way around. Second, the Director is given broad authority to determine how the tax should be determined. N.J.S.A. 54:32B-19; -24(4), (5) and (6). It is within his discretion to determine that it is not cost-effective to make a life-style *243 investigation into the owner of every bar and restaurant in New Jersey that appears to have underreported its sales and income. In this case, Mr. Yilmaz has admitted that he used much of the underreported tax monies to expand and operate his business. Such expenditures would not affect his lifestyle.
I therefore grant in part and deny in part the Director’s motion to exclude the documents appended to plaintiffs brief. I conclude that the plaintiff has failed to overcome the presumption that the Director’s assessment is correct, and I affirm the final determination. Pursuant to R. 8:9-3, counsel are directed to confer with respect to the computation of tax and interest that remain due after plaintiffs payment of undisputed tax on the cover charges and the plaintiffs amnesty payment. If the parties are unable to agree as to the amount of the remaining assessment, including accrued interest and penalties, they shall submit proposed computations to the court pursuant to R. 8:9-4 no later than thirty days from the date of this decision.

 According to the accountant, he had prepared the CBT returns for those tax years well before the audit and had forwarded them to Mr. Yilmaz for signature and filing. As the accountant conceded, the plaintiff had no record of paying the minimum tax reported to be due on those returns and the Division had no record of receiving them until they were forwarded by the accountant to the auditor in May 1999.

 No 1998 CBT return was filed during the period that the audit was conducted, that is, from March 1999, when the auditor made his initial contact with the plaintiff, through August 21, 2001, when a notice of assessment related to the final audit determination was issued.

 The conference report is produced by a Division employee, known as a conferee, following the hearing of the administrative protest, which the Division calls a conference.

 Gross income tax, which is required to be withheld by the employer, is also a trust fund tax. N.J.S.A. 54A:7-5.

 Although these numbers do not add up, these are the numbers to which the parties stipulated. The difference is insignificant (less than $1).