MENYUK, J.T.C.
This is the court’s opinion following trial of this action, which contests the defendant’s denial of plaintiffs claim for a refund of sales and use tax. At issue is whether plaintiff was entitled to collect sales tax at the reduced rate authorized by the Urban Enterprise Zone Act, N.J.S.A. 52:27H-60 to -88 (“UEZ Act”), on its sales of building materials that were used in the construction of the Borgata Hotel and Casino in Atlantic City.
Defendant Director, Division of Taxation (“Director”) contends that plaintiff NFF Construction, Inc. (“NFF”) should have collected tax at the then full rate of 6%, because NFF did not regularly operate a place of business for the purpose of making retail sales within the urban enterprise zone, and was therefore not eligible to be certified as a business authorized to collect tax at the reduced rate of 3%; that NFF did not regularly exhibit and offer for sale the goods at issue here at its location in the urban enterprise zone; and that the transactions in issue did not qualify as retail sales under the UEZ Act. The Director maintains that NFF is liable for the uncollected remaining 3% sales tax due under the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29 (“S & U Tax Act”).
NFF asserts that it adequately demonstrated that it maintained a place of business for the purpose of making retail sales in the urban enterprise zone, that the transactions in issue were retail sales, and that it was authorized by the Director to collect tax at the reduced rate, thereby entitling it to rely on the Director’s authorization. It accordingly asserts that it is not liable for the tax deficiency.
For the following reasons, the Director’s final determination denying plaintiffs refund claim is affirmed.
During the audit period, NFF was located at 619 Church Street in Pleasantville, New Jersey. There is no dispute that NFF’s offices are located within an urban enterprise zone (“zone”), as *4 defined by N.J.S.A. 52:27H-62a. In 1996, NFF initially applied for and was granted a certificate of authority authorizing NFF to collect sales taxes at a reduced rate on retail sales of tangible personal property at NFF’s location within the zone, as authorized by the UEZ Act. N.J.S.A 52:27H-80. NFF continued to be authorized to collect tax at the reduced rate throughout the period at issue here.
This action arises from an audit of NFF by the New Jersey Division of Taxation (“Division”) for the period January 1, 2000 through December 31, 2003. The audit was conducted in 2004. The auditor’s report included the observation that plaintiffs home office did not have a retail sales display area and that there were no materials inventoried for sale. The auditor concluded in his report that plaintiffs business was not regularly operated for the purpose of making retail sales and that the certification issued by the Director pursuant to N.J.S.A 52:27H-80, authorizing the plaintiff to collect sales tax at the reduced rate, had been issued in error. The auditor did not testify at trial, and it is unknown what portion of NFF’s premises he actually viewed, or what facts he relied on to reach his conclusions.
The auditor determined that certain sales of building materials made by NFF to a subcontractor on the construction of the Borgata, were subject to tax at the full 6% rate of tax then in effect,[1] where NFF had collected tax on the sales at the reduced rate of 3%. The auditor assessed a sales and use tax deficiency of $124,958.20, which included tax on another transaction that NFF does not dispute was taxable, plus penalty and interest. NFF made payments of $6,044.04 on April 2, 2004, $100,000 on March 31, 2005, and $39,727.04 on May 4, 2005, and thereafter filed a refund claim in the amount of $139,727.04 pursuant to N.J.S.A. 54:49-14(b). The refund claim was denied. The taxpayer filed an administrative protest of the denial. The Director upheld the denial of the refund claim in a final determination letter dated March 5, 2009, and plaintiff filed a timely appeal with the Tax *5 Court. The parties thereafter filed cross-motions for summary judgment, which were denied, and the matter proceeded to trial.
NFF is a subchapter S corporation founded in 1984 as a small general contracting firm engaged in doing casino renovations. NFF’s only witness at trial was Frank Lundy, currently NFF’s president and sole owner. During the audit period, Mr. Lundy was a minority (49%) owner and vice president of the company. Nate Gainer, who has since retired, owned the remainder of the company and was its president. Mr. Lundy’s father served as an advisor to the business.
Mr. Lundy testified that, at some point, they[2] decided to get into the carpet installation business. They subsequently observed that one of their competitors had opened up a retail carpet showroom. They determined that they would follow suit. As best as Mr. Lundy could recall, this occurred in the early 1990’s. Mr. Lundy and his father purchased the building at 619 Church Street in Pleasantville. In addition to the property at 619 Church Street, Mr. Lundy also testified about two other buildings, one located on New Road and the other, a former hardware store, at Noah’s Road. All of the real estate was owned by an entity called F & F Realty, owned by Mr. Lundy and his father. The three buildings were adjacent to each other and all were located within the zone. Mr. Lundy testified that it had been his intention to start a business selling doors at the building on Noah’s Road.
According to Mr. Lundy, the back half of the Church Street building was a warehouse and the front half housed the company’s offices and carpet showroom. He indicated that what had been the sales area is currently a conference room. It is not clear when that area ceased being used for sales, but according to Mr. Lundy, NFF’s retail business “sputtered” when the casinos stopped growing. NFF no longer conducts a retail sales business.
Mr. Lundy stated that they had the showroom area built out with fixtures for display, and that they installed special lighting to *6 highlight the products they offered. According to Mr. Lundy, they sold carpeting and flooring not only to casinos but to “anybody that would come in off the street.” They initially displayed carpet and flooring samples, and various items used in connection with the installation of carpeting, such as knife blades, knife holders, and glues. They also sold door samples (apparently from the door business that Mr. Lundy had contemplated opening in one of the other buildings), and goods salvaged from various casino renovation projects that they had completed.
Mr. Lundy stated that, at the time they opened the retail showroom, it was their intention to sell anything that made sense at the time. At some point, they displayed and sold sinks and mirrors, as well as a variety of nuts and bolts that Mr. Lundy had obtained when the former hardware store was purchased. Mr. Lundy further testified that the showroom also displayed products such as formica and various types of moldings used in building construction. There was no testimony as to when NFF expanded its business from the sale of carpeting and flooring to the display and sale of these various other products.
As evidence of its retail sales, NFF produced three documents labeled “job records,” which were recent computer printouts of three undated sales transactions. One was a sale of Casbah doors to the Taj Mahal; the second sale was of three benches to the Egg Harbor Township Board of Education; and the third was a sale of column covers to Cirigliano Contracting.
In addition to NFF, Mr. Lundy and Mr. Gainer formed an entity called Floor Resources, Incorporated, or FRI, into which they spun off and eventually sold their retail carpet business. It was Mr. Lundy’s recollection that the sale occurred in 2004 or 2005. On cross-examination, Mr. Lundy at first stated that he could not recall when Floor Resources was formed and that it was inactive during the audit period. His recollection was subsequently refreshed and he recalled that Floor Resources was formed in 1993, and that “we probably co-mingled the businesses.” He also testified that, at some unspecified date, the retail carpet showroom was moved to the Noah’s Road building. It is unknown whether *7 Floor Resources had its own certifícate authorizing it to make retail sales at the reduced sales tax rate in the zone.
There was no direct testimony as to the volume or amount of NFF’s retail sales business. On cross-examination, however, Mr. Lundy was shown combined sales tax and urban enterprise zone monthly sales tax returns for the period February 2001 through November 2003. Those returns reported that no taxable sales were made from February 2001 through November 2002 and from August 2003 through November 2003. The only period for which taxable sales were reported were December 2002 through July 2003, which roughly corresponds to the time period in which the transactions at issue here took place. Mr. Lundy testified that they had some slow periods.
Notwithstanding that the corporate income tax returns for the audit period reflected that NFF did not maintain any inventory of goods, Mr. Lundy testified that to the best of his knowledge, NFF did maintain an inventory of retail goods. It was also his testimony that he did not prepare the tax returns and had no role in their preparation. He did, however, sign the corporate business tax return for tax year 2002.
Of the building construction products carried by NFF, Mr. Lundy cited, in particular, GFRG, or glass fiber reinforced gypsum, which was the material sold in the transactions that are at issue here. According to Mr. Lundy, gypsum is the principal component in drywall, and it can be cast into various types of moldings. The fiberglass reinforces the gypsum. GFRG was popular in casino construction because it was useful in decorative moldings, was less expensive than plaster, and, unlike wood, it met fire codes. Mr. Lundy also described GFRC, or glass fiber reinforced concrete. Mr. Lundy testified that it was similar to GFRG that is used either on exteriors or in high traffic areas, because it is stronger than gypsum. According to Mr. Lundy, NFF displayed GFRG and GFRC on one of the racks on the showroom walls, along with samples of formica and other building products. Although there was no direct testimony as to whether NFF maintained an inventory of GFRG and GFRC, apart from *8 the samples Mr. Lundy testified were shown in the showroom, it is clear from Mr. Lundy’s testimony and the purchase orders in evidence that all of the sales at issue here were of custom-ordered material that was manufactured specifically for the construction of the Borgata.
Mr. Lundy testified that he learned that GFRG was being used in the construction of the Borgata. He stated that he was familiar with the product and had some samples of it. He decided to “pitch” the sale of GFRG to a Borgata contractor, KHS & S, on the basis that the sale would be at a reduced rate of tax because of NFF’s location in the zone. KHS & S is, according to Mr. Lundy, one of the largest interior contractors in the country. Mr. Lundy testified that, prior to approaching KHS & S, he consulted with Roger Tees, the urban enterprise zone coordinator for Pleasant-ville. See N.J.A.C. 5:120-1.2, defining the term “coordinator” as it pertains to an urban enterprise zone. Mr. Lundy testified that he described the transaction as proposed to Mr. Tees:
I said that I would like to sell the Borgata some material that we handle, and I will have them come into our office — actually it was KHS & S. I’ll have KHS & S come into our office, go — actually write the purchase order and sign it there, they’ll hand it to me there. I will then order the material. I’ll have it brought to oúr office were it will be inspected and, if necessary, shaken out so that the customer gets the material packaged the way he wants, and then at that point in our yard it will be turned over for his disposition, however he wants to do it.
[I] said [to Mr. Tees] I’d be paid, and then checks would be paid to me when the materials came in and then they were handed over to KHS & S and I’d get a check in my office.
Mr. Lundy further testified that he would not have proceeded with the transaction had he received a negative reaction from Mr. Tees as to the transaction’s eligibility for taxation at the zone’s reduced rate of sales tax.
It is not clear precisely when NFF began dealing with KHS & S. There was evidence of two purchase orders. There was a change order dated May 20, 2002, issued by KHS & S to NFF, which made changes to an apparently pre-existing purchase order that was not in evidence. As amended by the change order, the purchase was for “GRG limestone finish” in the amount of *9 $344,426.62 plus sales tax in the amount of $16,722.50,[3] for a total purchase of $361,149.12. The order stated that the purchase was “F.O.B. Jobsite.” On May 30, 2002, KHS & S issued NFF a purchase order for the purchase of “GRG theme elements” in the amount of $2,622,605 plus sales tax at 3%, $78,678.15, for a total cost of $2,701,283.15. The order again stated that the purchase was “F.O.B. Jobsite.” The “ship to” instructions on the purchase order provided that the material was to be sent to KHS & S at 1501 MGM Mirage Blvd., Atlantic City, New Jersey.
The invoices presented in evidence demonstrated that NFF sold the material to KHS & S at cost; that is, NFF charged KHS & S the same amount for the materials as NFF was billed by its suppliers. According to Mr. Lundy, he treated the transactions in issue as loss leaders. In his words, he wanted to “get a foot in the door” with KHS & S, because he knew that the Borgata would be a huge project and he was hoping that he would get further business. He also intended to impress the Borgata with the hope of future business. He testified that NFF eventually did get further business as a consequence of these transactions. He did not indicate whether that later business was with KHS & S or with the Borgata or whether the work was as a supplier of building materials or as a construction contractor. Mr. Lundy did testify that NFF successfully bid for a contract to supply “FF & E” (that is, fixtures, furnishings and equipment), for the Borgata.
Mr. Lundy testified that KHS & S placed the orders for GFRG at the offices in the zone and that the orders were delivered by truck to the offices in the zone. He further testified that, when the product was delivered, his employees would go through the shipping manifest, do a piece count and ascertain that there was no damage to the product. Employees would sometimes move the product around on the truck if KHS & S had indicated it wanted a particular placement of the material on the truck. Mr. Lundy’s employees would sometimes remove shrink-wrapping from the *10 product while the product was in the zone. According to Mr. Lundy, no NFF employee ever touched the product after it was turned over to KHS & S at NFF’s offices in the zone.
Mr. Lundy’s testimony indicates, however, that in most cases, the product never left the truck on which it was delivered and that the same trucks that delivered the product to NFF’s offices in the zone hauled the product to the project site in Atlantic City. As already noted, KHS & S purchase orders stated that the material purchased from NFF was to be “F.O.B. Jobsite,” and directed that the product be delivered to KHS & S in Atlantic City. At least one invoice from an NFF supplier of GFRG for KHS & S stated that the product was shipped to “K Borgata Retail Piazza, 1501 MGM Mirage Blvd., Atlantic City, New Jersey.” The remaining supplier invoices did not indicate a shipping address, but referred to bills of lading, and in some cases referred to “attached” bills of lading, none of which were attached to the invoices in evidence. An employee of the Division of Taxation had requested these same bills of lading in connection with the administrative protest of the assessment in issue but they were not produced. Mr. Lundy could not provide any explanation as to where the bills of lading might be, except that he thought that the truckers would have kept them when they drove the materials to the job site.
Mr. Lundy testified that he remained the vice president of NFF until 2003 or 2004, which was about the time that Mr. Gainer retired. At that time, KHS & S offered him a job as president of a related entity, KHS & S Contractors of New Jersey, Inc. (“KHS & S-NJ”). NFF sold its assets in bulk to KHS & S-NJ and subcontracted some of its remaining work to it. Some of NFF’s employees went to work for KHS & S-NJ, although according to Mr. Lundy, those workers may have nominally remained on the NFF payroll because of NFF’s existing union contracts. Mr. Lundy was with KHS & S Contractors of New Jersey for only a short time — he could not recall precisely the period of his employment — and he then left, in his words, “not on the world’s best of terms,”
*11 The UEZ Act “was intended to stimulate economic activity in certain areas of economic distress ... ‘characterized by high employment, low investment of new capital, blighted conditions, obsolete or abandoned industrial or commercial structures, and deteriorating tax bases.’ ” Fedway Associates, Inc. v. Director, Div. of Taxation, 14 N.J.Tax 71, 76 (Tax 1994) (quoting N.J.S.A. 52:27H-61(a)), aff'd, 282 N.J.Super. 129, 659 A.2d 536 (App.Div. 1995). In furtherance of the purpose of stimulating economic activity in the authorized zones, the UEZ Act offers certain incentives, including reduced sales tax on sales made from a zone. Fedway Associates, supra, 14 N.J.Tax at 76. N.J.S.A. 52:27H-80 provides that, except for certain retail sales not relevant here (for example, sales of motor vehicles, alcohol, cigarettes, manufacturing equipment and energy) receipts from retail sales made by a certified vendor from a place of business owned or leased and regularly operated by the vendor for the purpose of making retail sales, and located in a designated zone, are exempt to the extent of 50% of the tax imposed under the S & U Tax Act.
During the audit period, the UEZ Act further provided:
Any vendor, which is a qualified business having a place of business located in a designated enterprise zone or in a designated UEZ-impacted business district, may apply to the Director of the Division of Taxation in the Department of the Treasury for certification pursuant to this section. The director shall certify a vendor if he shall find that the vendor owns or leases and regularly operates a place of business located in the designated enterprise zone or in the designated UEZ-impacted business district for the purpose of making retail sales, that items are regularly exhibited and offered for retail sale at that location, and that the place of business is not utilized primarily for the purpose of catalogue or mail order sales. The certification under this section shall remain in effect during the time the business retains its status as a qualified business meeting the eligibility criteria of section 27 of P.L.1983, c. 303 (C.52:27H-86). However, the director may at any time revoke a certification granted pursuant to this section if the director shall determine that the seller no longer complies with the provisions of this section.
[N.J.S.A. 52:27H-80[4]]
Pursuant to the authority granted by N.J.S.A 52:27H-81, the Director has promulgated regulations pertaining to the reduced *12 rated of sales tax set forth at N.J.S.A 52:27H-80. During the audit period, N.J.A.C. 18:24-31.4 provided,[5] in pertinent part:
(a) Sales tax is imposed at 50 percent of the statutory rate, on receipts from retail sales, with exceptions stated in (b) or (c) below, made by a certified vendor which is a qualified business from a place of business owned or leased, and regularly operated by the vendor for the purpose of making retail sales, and located in a designated enterprise zone or UEZ-impacted district.
(d) In addition to being a qualified business, a certified vendor must regularly operate a place of business for the purpose of making retail sales. Items of tangible personal property must be regularly exhibited and offered for retail sale at this location, and the place of business may not be utilized primarily for the purpose of catalog or mail order sales.
(e) All sales made by a qualified and certified vendor must be made from his place of business within an enterprise zone or district, that is, either the purchaser must accept delivery at the vendor’s place of business within an enterprise zone or district, or the vendor must deliver the tangible personal property from its place of business within an enterprise zone or district. Only receipts from sales which originate and are completed by the purchaser in person at the vendor’s place of business within an enterprise zone or district qualify for the reduced rate of sales tax; provided, however, that after a sale has been completed within an enterprise zone or district, the vendor may deliver the tangible personal property to the purchaser at a location outside an enterprise zone or district.
1. Receipts from mail order, telephone, telex and similar sales transactions are subject to sales tax at the regular rate where delivery is made to a location within this State.
The term “retail sales” is not defined by either the UEZ Act or the regulations promulgated by the Director pursuant to the UEZ Act. The term is, however, defined by the S & U Tax Act to include “[s]ales of tangible personal property to all contractors, subcontractors or repairmen of materials and supplies for use by them in erecting structures for others, or building on, or otherwise improving, altering, or repairing real property of others.” N.J.S.A. 54:32B-2(e)(2).
*13 Pursuant to the UEZ Act, the Director is charged with certifying that a vendor is qualified to collect tax at the reduced rate authorized by N.J.S.A. 52:27H-80. That is, the Director is charged with determining whether a vendor owns or rents a place of business located within a zone that is regularly operated by the vendor for the purpose of making retail sales; that the vendor regularly exhibits and offers items for retail sale at that location; and that the business is not utilized primarily for the purpose of catalogue or mail order sales. Id. As already noted, the Director is also charged by the UEZ Act with promulgating regulations pertaining to the special tax provisions of the UEZ Act. N.J.S.A. 52:27H-81.
New Jersey courts generally defer to the statutory interpretation of the agency charged with enforcing it. Koch v. Dir., Div. of Taxation, 157 N.J. 1, 8, 722 A.2d 918 (1999). Consequently, the Director’s interpretation of N.J.S.A 52:27H-80 will prevail “ ‘as long as it is not plainly unreasonable.’ ” Ibid., quoting Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984).
Moreover, the Director’s assessments of tax are presumed to be correct. Atlantic City Transp. Co. v. Director, Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953) (quoting Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)); L & L Oil Service, Inc. v. Director, Div. of Taxation, 340 N.J.Super. 173, 183, 773 A.2d 1220 (App.Div.2001); Yilmaz v. Director, Div. of Taxation, 22 N.J.Tax 204, 231 (Tax 2005), aff'd 390 N.J.Super. 435, 915 A.2d 1069 (App.Div.2007), certif. denied 192 N.J. 69, 926 A.2d 854 (2007); Meadowlands Basketball Associates v. Director, Div. of Taxation, 19 N.J.Tax 85, 90 (Tax 2000), aff'd, 340 N.J.Super. 76, 773 A.2d 1160 (App.Div.2001); Newman v. Director, Div. of Taxation, 14 N.J.Tax 313, 318 (Tax 1994), aff'd, 15 N.J.Tax 228 (App.Div.1995); Ridolfi v. Director, Div. of Taxation, 1 N.J.Tax 198, 202-03 (Tax 1980). The plaintiff has the burden of proving that the assessment is erroneous. Atlantic City Transp. Co., supra, 12 N.J. at 146, 95 A.2d 895; Yilmaz, supra, 22 N.J.Tax at 231 Seventeen Thirty Corp. v. Director, Div. *14 of Taxation, 18 N.J.Tax 168, 179 (Tax 1999); Newman, supra, 14 N.J.Tax at 318.
The Director maintains that NFF has failed to meet this burden of proof. More specifically, the Director asserts that NFF failed to demonstrate that it regularly operated a place of business for the purpose of making retail sales, that it failed to establish that it sold items that were regularly exhibited and offered for sale at its location in the zone, and that it failed to show that the transactions with KHS & S constituted qualified retail sales within the meaning of the UEZ Act and the Director’s regulations promulgated under the UEZ Act.
NFF does not assert that the Director’s regulations are unreasonable or invalid. It maintains that it fully demonstrated through Mr. Lundy’s testimony that it maintained a place of business in the zone that was regularly operated for the purpose of making retail sales, that it engaged in retail sales and that it regularly displayed items for sale in its showroom located in the zone. Consequently, it concludes that it was authorized to collect tax at the reduced rate.
NFF first contends that, as set forth in the pretrial order, the only issue for trial was “whether, during the period in question, the plaintiff maintained a place of business in the designated enterprise zone regularly operated for the purpose of making retail sales such that plaintiff could collect the reduced sales tax rate from KHS & S rather than the full tax rate.” This contention is inaccurate. Item 4(A) of the pretrial order provided that, in addition to the issue quoted above, the issues to be determined at trial or to be addressed by the briefs also included the following issue: “Is plaintiff entitled to a refund of sales tax in the amount” of $139,727.04? This is a rather broad statement that encompasses virtually all aspects of the transactions in question, but it is a statement that was agreed upon by both parties.
NFF relies almost entirely on Mr. Lundy’s testimony to carry its burden of proof. The court finds that Mr. Lundy was not entirely credible. Mr. Lundy was vague and imprecise when testifying as to the dates or details regarding the operation of his *15 businesses, including the precise period during which NFF operated a retail business in the zone. He disclaimed any knowledge of how NFF completed its tax returns or maintained its business records. He testified that “we” took certain actions, without specifying if “we” meant NFF or some other entity such as Floor Resources, Inc.
Mr. Lundy’s testimony, together with the meager records of three retail transactions, persuades me that, at some point in time, he and Mr. Gainer or one or more of their business entities maintained a business in the zone that sold carpeting and other odds and ends that NFF obtained in connection with its construction business or that Mr. Lundy and Mr. Gainer obtained in connection with other businesses operated by them. However, there is no credible evidence that NFF regularly displayed GFRG and GFRC or that NFF regularly sold such material at retail.[6] There was no apparent need to display those materials, because contractors such as KHS & S were fully familiar with them. Moreover, contractors such as KHS & S know exactly what they need and can order the materials directly from the supplier. Obviously, however, a contractor is liable for sales or use tax at the full rate when it makes that purchase directly.
Most significantly, however, Mr. Lundy’s testimony, as it pertained to the specific elements of the transactions with KHS & S, was particularly lacking in credibility. The court notes first, that on the earlier motion for summary judgment, NFF maintained that it was KHS & S that approached Mr. Lundy regarding the purchases at issue. At trial, it was Mr. Lundy’s testimony that it was he who initiated the sales by “pitching” the sale to KHS & S. This variation in facts would make no difference in the amount of tax due, assuming, of course, that the transactions were ultimately structured to comply with the requirements of N.J.S.A. 52:27H-80 *16 and N.J.A.C. 18:24-31.4. Nevertheless, the court was left with the impression that this inconsistency resulted from someone’s determination that it would be more persuasive to relate that the transactions with KHS & S resulted from a deliberate expansion of NFF’s retail business over some unspecified period of time to include the display and sale of the particular construction materials involved in these transactions, rather than being a serendipitous one-time business opportunity that was brought to NFF by KHS & S.
As already noted, the court observed that Mr. Lundy’s manner of speaking during his testimony was generally informal, and lacked precision in the timing of events and in the specifics of who was involved in various events. This contrasted sharply with his testimony as to the proposed structuring of the transactions with KHS & S as he related them to the local UEZ coordinator. The language that he used there was precise and appeared to have been well-rehearsed.
Finally, the meager documentation of the KHS & S transactions that was presented at trial not only did not corroborate Mr. Lundy’s testimony, but it contradicted him. Mr. Lundy testified that he turned over the materials to KHS & S at NFF’s offices in the zone. However, one invoice to NFF from one of the suppliers of GFRG stated that the material was shipped to Atlantic City. All of the remaining invoices referred to attached bills of lading which would have indicated where the materials were delivered and to whom they were delivered. In each and every case, those bills of lading were missing, and no credible explanation was provided for their disappearance.
The purchase orders from KHS & S to NFF stated that the purchases were F.O.B. jobsite, which was in Atlantic City, not the zone where NFF operated its business. The Uniform Commercial Code provides:
Unless otherwise agreed the term F.O.B. (which means “free on board”) at a named place, even though used only in connection with the stated price, is a deliveiy term under which ... (b) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and, there tender delivery of them in the manner provided in this Chapter. ____
*17 [N.J.S.A. 12A:2-319(1)(b) (emphasis added) ].
There was no evidence that KHS & S agreed to amend the purchase orders and accept delivery in the zone. Mr. Lundy’s testimony that he “turned over” the materials to KHS & S in the zone was devoid of any detail as to how this was accomplished, and was not corroborated by testimonial or documentary evidence. Mr. Lundy’s testimony that someone from KHS & S came to NFF offices in the zone to deliver the purchase orders was also not corroborated.
I conclude that the transactions were not completed in the zone but were, instead, completed in Atlantic City, contrary to the provision of N.J.A.C. 18:24-31.4(e), that only receipts from sales originated and completed by a purchaser in person at the seller’s place of business in the zone qualify for the reduced rate of sales tax. If a transaction has, in fact, been completed within the zone, the seller may then transport the goods to the zone. In this case, there was no credible evidence that KHS & S originated and completed the sale in the zone. The overwhelming documentary evidence demonstrates that the sale was completed in Atlantic City, where, according to the terms of the purchase order, delivery was to be tendered.
Because the sales transactions between NFF and KHS & S were not originated and completed within the zone, the sales do not qualify for the reduced rate of tax. N.J.A.C. 18:24-31.4(e). Accordingly, I find that NFF is not entitled to a refund of sales taxes that were properly assessed against it.
Alternatively, NFF argues that it was entitled to rely on the Director’s issuance of the certification that NFF was a vendor authorized to collect tax at the reduced rate. I conclude that there was no reasonable reliance on the certificate issued by the Director where NFF failed to comply with the Director’s regulations.
The UEZ Act certainly contemplates that the Director may revoke a certification if “the vendor no longer complies with the provisions of this section.” N.J.S.A 52:27H-80. Mr. Lundy was well aware that, to be eligible for the reduced rate of tax, the *18 transactions must originate and be concluded within the zone, as required by N.J.A.C. 18:24-31.4(e). It was his testimony that he told the UEZ coordinator that the transactions with KHS & S were to take place entirely within the zone, with the purchase orders to be personally delivered to NFF offices, and with the goods to be turned over to NFF within the zone. The difficulty here is that there was no credible evidence that the transactions were actually structured that way.
The UEZ Act, N.J.S.A. 52:27H-80, sets out the types of businesses that may be authorized to collect sales tax at the reduced rate. The UEZ Act also plainly authorizes the Director to promulgate rules and regulations “as may be necessary to effectuate the provisions of’ N.J.S.A. 52:27H-80. N.J.A.C. 18:24-31.4 specifically requires that, in order to qualify for tax at the reduced rate, a sales transaction must take place entirely within the zone. This is consistent with the purpose of the UEZ Act to stimulate economic activity within the zone. The certificate of authority issued by the Director to NFF specifically referred to N.J.A.C. 18:24-31.4. I conclude that NFF could not reasonably rely on the Director’s certificate for the proposition that all of its sales, whether or not in compliance with the Director’s regulations, were eligible for the reduced rate of sales tax.
In sum, NFF failed to carry its burden of establishing that the Director’s assessment of tax was incorrect. The Director’s denial of NFF’s refund claim is affirmed and the complaint is, therefore, dismissed with prejudice.

 The S & U Tax Act was later amended to increase the rate of sales tax and use tax to 7%. L. 2006, c. 44, §§ 2, 5.

 It is unclear whether Mr. Lundy was referring solely to himself and Mr. Gainer, or whether his father was involved in these business decisions.

 It is unknown how the tax was calculated. The stated tax amount was neither 3% or 6% of the purchase; rather, it was about 4.9% of the purchase price.

 Subsequent to the audit period N.J.S.A. 52:27H-80 was amended by L. 2011, c. 49, § 15 to change the term “vendor” to the term “seller,” and to substitute "director" for "he” in the fifth line of the paragraph quoted above.

 During the audit period, N.J.A.C. 18:24-31.4 was amended to insert provisions pertaining to UEZ-impacted districts. See 35 N.J.R. 2165(a) (May 19, 2003); 35 N.J.R. 3848(a) (Aug. 18, 2003). Subsequent to the audit period, N.J.A.C. 18:24-31.4 was amended to substitute "seller” for "vendor" throughout, to delete former subparagraph (f) (pertaining to the lease of tangible personal property) and to make other minor, insubstantial editorial changes. See 40 N.J.R. 1777(a) (Apr. 7, 2008); 40 N.J.R. 6832(a) (Dec. 1, 2008).

 N.J.S.A. 52:27H-80 and the Director's regulations construing that section are not clear as to whether the vendor must regularly display and sell the particular item or type of item in order for the receipts from that sales transaction to be taxable at the reduced rate. In view of the court's conclusion that the transactions in issue here did not conform with the Director's regulations, that issue need not be decided here.