HOPKINS, J. T. C.
This is an appeal from the determination of the Director, Division of Taxation, that Duncan Truck Stop, Inc. was liable for deficiencies in motor fuel tax for the 14-month period September 1, 1976 to October 31, 1977, in the amount of $210,-746.88, together with penalty of $10,537.34 and interest to August 15, 1979 in the amount of $83,234.19.
Duncan is a licensed retail dealer of fuel as defined by N.J.S.A. 54:39-5. It was the lessee of a fuel service station located at 376 Duncan Avenue, Jersey City, New Jersey. Duncan’s lease provided that Clairco Oil, Inc., its lessor, would provide all fuel oil at going rates as needed by Duncan in the operation of the business conducted on the premises. Since Duncan did not have a “B” license under N.J.S.A. 54:39-64(b), it was required to pay the tax on fuel as it was purchased from a wholesale dealer. Duncan has alleged that it made all its fuel purchases from Clairco, who was a wholesaler and holder of a special license “B”. Clairco, in turn, was responsible for filing monthly returns and paying the tax on the fuel sales.
During the first part of the period under review, Duncan operated with three diesel fuel pumps. However, prior to April 1, 1977, two additional pumps had been installed. The station was open 24 hours a day, five days a week, with Darrell Crago, the owner of Duncan’s stock, occasionally opening up the station on Saturdays. The station was located at a jug handle exit from Route 1-9 and was large enough and the pumps sufficiently apart that at least three trucks could be fueled at one time. Clairco’s offices, as well as offices of some trucking companies, were located in the building on the premises. The general area was large enough so that trucks could park without interfering with the fueling operation.
Michael Soriano, an investigator for the Division of Taxation, together with another investigator, commenced an investigation *370 of Duncan on March 12, 1977. Duncan had attracted Soriano’s attention because its fuel prices were at least three to four cents a gallon lower than the prices of other major truck stops in that area and, further, the reported gallonage sold for each month, in the approximate amount of 45,000 gallons, seemed far less than the volume of business which he observed. At some date prior to November 30, 1977 Soriano and his partner advised Crago that they wanted to perform a retail dealer examination of Duncan. That examination would include an audit of all purchases and sales of diesel fuel.
Duncan, as a retail dealer, was required to keep a daily record showing the amount of fuel sold each business day and to preserve such records for a period of one year. N.J.S.A. 54:39-34; N.J.A.C. 18:18^.6. Further, it was required to maintain a record of fuels received and sold, the amount of tax paid to the distributor as part of the purchase price, together with delivery tickets, invoices and bills of lading and such other records as the Director may require. N.J.S.A. 54:39-33. The Motor Fuels Use Tax Act, N.J.S.A. 54:39A-1 et seq., provides that a licensed vendor of motor fuel is subject to a fine if it does not supply a receipt or invoice on the sale of motor fuel to a motor vehicle, including a road tractor or a truck tractor or any truck having a gross weight in excess of 18,000 pounds alone or in combination with a motor drawn vehicle. The Motor Fuel Use Tax Act also requires that persons owning and operating trucks or truck tractors keep all records, including fuel purchase invoices, which were received from their vendors and which reflect the total number of gallons of fuel purchased in New Jersey. N.J.S.A. 54:39A-9; N.J.A.C. 13:18-4.10.
When Crago or another employee of Duncan utilized an invoice to reflect the sale of diesel fuel, it was prepared in three parts, with the original white and yellow copies going to the truck driver and the pink copy retained for Duncan’s records. One of Duncan’s employees testified that, on occasion, he would merely fill in the pink copy for Duncan’s records and not fill in the white and yellow which were supplied to the truck driver.
*371 On November 30, 1977 Crago made available to Soriano and his partner the Duncan records, which included daily sales tickets for sales of diesel fuel, records showing purchases of diesel fuel, and daily meter readings. At that time Crago advised Soriano that the sales slips were in very good order. Since the records were voluminous, Soriano requested and obtained permission to remove the records to his office for audit.
As part of their investigation Soriano and his partner had been conducting a physical surveillance of the fuel station and had obtained the names of trucking companies that had purchased fuel from Duncan. They also checked the fuel pump meters for the purpose of determining the amount of fuel sold. Soriano testified that he observed that the meters had been changed without the ending reading of the old meter and the beginning reading of the new meter shown on the records of Duncan. Further, the testimony was that the meters could be easily disconnected and removed and that Crago was fully familiar with that procedure.
Using information obtained from their surveillance as well as the information shown on the sales tickets supplied by Duncan, Soriano sent requests to approximately 30 of Duncan’s customers for information on their purchases from Duncan. Eleven companies responded with copies of their records, including Duncan invoices. The records supplied by the 11 carriers, when compared with the sales slips to those same carriers as shown on the records supplied by Duncan, reflected a large disparity. Duncan’s records showed sales of 112,818 gallons to those carriers, while the carriers’ records reflected purchases of 575,783 gallons from Duncan. The record shows that the 11 carriers used drivers who owned their own tractors. The Duncan invoices were submitted to the various carriers for the purpose of having the carriers prepare their New Jersey Highway Use Tax and not for reimbursement from the carriers. Further, the carriers compared the log sheets showing mileage driven by the various drivers against those diesel fuel purchase invoices.
*372 When the investigators advised Crago of the discrepancy between the records he had supplied and the records obtained from the 11 customers, he then stated that the records he had supplied had been reconstructed. He stated that Duncan’s original records had been destroyed. Crago testified that a large container in which the records were stored had been removed from its location during the installation of additional fuel tanks for Clairco on the Duncan Avenue premises. He stated that when the contractors pulled the container from its.location, the bottom came out and his records were strewn all over the yard and thereafter he reconstructed the records from memory. He also testified that the reason for the reconstruction was to use the records to justify receipt of a “B” wholesaler’s license.
Having concluded that Duncan’s records only reflected approximately 20% of its sales to the 11 carriers whose records had been, supplied to them, the State investigators determined that the records which Duncan had supplied to them were deficient by the same percentage of all the recorded sales. Accordingly, they determined a deficiency in motor fuels tax by applying the 20% ratio to the motor fuel purchases on which Duncan had paid tax. The records supplied by Duncan showed that it had purchased from Clairco, Inc., during the period under review, a total of 658,584 gallons on which taxes had been paid. The Director’s determination was that taxes should have been paid on a total of 3,292,920 gallons, with the difference of 2,634,336 gallons representing untaxed purchases.
Duncan, in contesting the assessment, seeks to totally disavow the accuracy of the reconstructed records and attacks the deficiency on two grounds, namely, that the 11 customers contacted purchased approximately 85% of its sales during the period involved with the necessary conclusion that total sales during the period amounted to 677,392 gallons as compared with Clair-co’s records of sales to Duncan, on which taxes were paid, of 658,584 gallons. Duncan also argues that the Director’s determination is arbitrary since it concluded a monthly volume which the station was incapable of selling during that period.
*373 Both parties recognize that the primary issue is whether the audit procedure used by the Division of Taxation was reasonable and whether the resulting assessment was justified by the facts. Further, they recognize that there exists a presumption in favor of the action of the Director and that the taxpayer has the burden of proof to show otherwise. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); Passaic v. Botany Mills, Inc., 72 N.J.Super. 449, 454, 178 A.2d 657 (App.Div.1962) certif. denied 37 N.J. 231, 181 A.2d 13. In matters involving taxation, which are civil in nature, the burden of proof means the obligation of a party to meet the requirements that the fact be proved by a preponderance of the evidence. Evid.R. 1(4). Factual findings of an administrative agency are generally sustained if they are supported by substantial evidence on the whole record. Atkinson v. Parsekian, 37 N.J. 143, 149, 179 A.2d 732 (1962); In re Boardwalk Regency Casino License Application, 180 N.J.Super. 324, 335, 434 A.2d 1111 (App.Div.1981).
Duncan’s efforts to overcome the presumption attaching to the determination of the Commissioner included the testimony of Duncan’s president and sole stockholder as to his estimate of the fuel sold during the period under review and an explanation as to why reconstructed sales records were furnished as original records to the Director’s investigators. This was corroborated by the testimony of its oil supplier that, pursuant to the lease agreement with Duncan, it was the sole supplier of oil during the period involved and its sales of fuel oil to Duncan, on which tax was paid, constituted the sole source of fuel sold by Duncan.
Both Crago and another Duncan employee, Lovelace, testified that the average fuel sale was between 10 and 50 gallons and that it took 10 to 15 minutes to service the average truck. Lovelace also testified that he was the sole employee on duty during the period 6 p.m. until 6 a.m.
The quantum of evidence necessary to rebut a presumption is not clearly defined in case law. Evid. R. 14 (Anno.1982), Comment 3. Where, as here, a taxpayer has the burden of proving a *374 negative, this question has given federal courts considerable difficulty. In Weimerskirch v. Comm., 596 F.2d 358 (9 Cir. 1979) rev’g 67 T.C. 672 (1977), the court held that, where the Commissioner of Internal Revenue determined that the taxpayer realized unreported earnings from the sale of heroin, the government could not rely entirely on a presumption of correctness in the absence of minimal evidentiary foundation for the deficiency, even though the taxpayer did not testify during the Tax Court trial. However, in U. S. v. Rexach, 482 F.2d 10, 15-17 (1 Cir. 1973), the court pointed out the problems that could arise in the use of both the presumption and the burden of proof in tax cases. The court there stated as follows:
Whatever uncertainty may once have existed because of our use of the general phrase “burden of proof” was dispelled by our opinion in United Aniline Co. v. C. I. R., 316 F.2d 701 (1st Cir. 1963) [a case involving constructive receipt of income and a petition to this Court for redetermination in respect of a notice of deficiency]. We there explicitly rejected the suggestion of the Fourth Circuit in Stout v. C. I. R., 273 F.2d 345, 350 (4th Cir. 1959), that the Commissioner’s assessment merely shifts to the taxpayer the burden of going forward with evidence, and disapproved the use of the term “presumption” because of the danger, illustrated in Clark v. C. I. R., 266 F.2d 698 (9th Cir. 1959), of misleading courts into believing that if the taxpayer introduced evidence from which it “could” be found that the assessment was erroneous, the burden of proof was placed on the Commissioner. We unambiguously stated that whether or not reference was made to a presumption, it must be made clear that “the taxpayer never loses the burden of proving the Commissioner’s determination erroneous.” 316 F.2d at 704; see also n. 4, “Presumption or no, the burden of proof never shifts.” [at 16]
In the present case I find that the taxpayer has introduced sufficient evidence to overcome the presumptive accuracy of the Director’s determination. This, however, does not necessarily mean that it has, by virtue of that evidence, satisfied its burden of showing that the total determination was invalid or arbitrary.
The record shows that Duncan, through Crago, submitted reconstructed records pertinent to its operation during the periods under review and that the Director relied upon said records as a starting point in its determination of additional tax liability. In so doing, the Director was fully within his right. Those records constituted admissions by the taxpayer and permitted *375 the Director to commence an investigation with those records as a starting point. As such, Duncan has not come forward with any more detailed records of its activities. However, it attempts to discredit them with respect to the allocation of sales to the 11 carriers who had supplied the Director’s investigators with their copies of Duncan’s invoices. Rather than 15% of sales to those 11 carriers, as indicated on the reconstructed records, Duncan now attempts to support its position by stating that said 11 carriers constituted 85% of its business. The only support for that contention was Crago’s uncorroborated testimony. Under the above facts, the Director could justifiably utilize the reconstructed records supplied by Duncan as a starting point in its examination. I further find that the Duncan invoices and records of purchases supplied by the 11 carriers constituted bona fide business records in their possession and that there was very little reason to believe that they did not accurately reflect sales by Duncan to the drivers utilized by those 11 carriers. The testimony on behalf of Duncan’s oil supplier, Clairco, is suspect since it would be virtually impossible for Duncan to engage in the sale of untaxed diesel fuel without Clairco’s cooperation. Duncan’s lease required it to purchase oil from Clairco. The investigators testified that Clairco’s truck was the only truck they observed making deliveries during their surveillance. Further, Clairco’s office was on the Duncan premises. Accordingly, I find that Duncan understated sales of diesel fuel, as reflected by the discrepancy between the reconstructed invoices and the carriers’ invoices, in the amount of 462,965 gallons.
As previously noted, the determination of the Director was not only predicated upon the difference between the discrepancy between Duncan’s records with respect to its fuel sales to the 11 carriers but was also on the use of the same percentage factor to increase Duncan’s sales, as reflected on his reconstructed records, to other customers. The Director’s counsel attempts to justify this attribution by pointing out that where a taxpayer has failed to keep proper records or when, for some other reason, it is unable to supply exact information, reason and common sense dictate that the Director use the most reasonable means *376 available to independently verify the retailer’s tax liability. In this respect, it is argued that the procedure constituted an appropriate formula based on a sampling. An appropriate sampling was approved by this court in Joseph G. Ridolfi, t/a Hub Bar and Liquor Store v. Director, 1 N.J.Tax 198 (Tax Ct. 1980). Further, Director relies on Russo v. Donohue, 10 Ohio St.2d 201, 226 N.E.2d 747, 754-56 (Sup.Ct.1967); Goldner v. State Tax Comm’n, 418 N.Y.S.2d 477, 479-480 (Sup.Ct.1979); Riley B’s, Inc. v. State Bd. of Equalization, 61 Cal.App.3d 610, 132 Cal. Rptr. 520, 523 (D.Ct.App.1976).
The sampling procedure authorized in the Ridolfi case was one in which the Director’s personnel, in an audit period of 2V2 years, made a detailed analysis of liquor sales for three sample months, of which all were different months in different years. By this procedure the ratio of off-premise liquor consumption to total sales was established. Russo v. Donohue, supra, involved a combined confectionery and beer and wine carryout store. There a court approved a sampling for two months in 1964 as well as a 14-day sampling to determine the percentage of sales at less than $.31. In Goldner v. State Tax Comm’n, supra, the court approved an eight-day sampling period to compute the tax liability for a 39-month period where the taxpayer failed to keep proper records. Lastly, in Riley B’s, Inc. v. State Bd. of Equalization, supra, the court approved an increased tax which was predicated upon an average normal markup on the cost of the items sold.
The aforesaid cases, all of which involved court-approved sampling or markup, show a characteristic which is not present in the subject case. There was no finding in any of the cases that the sampling period or markup percentage encompassed a period which did not bear a reasonable relationship to the period to which the findings from the sample period were applied. What is involved in this case is not a sampling as recognized for purposes of reconstructing income. There is nothing to support *377 a proposition that the 11 companies whose records were made available to the Director constituted a sample of Duncan’s activities. Rather, they represent a segment which may or may not be the same as the other Duncan customers. Actually, a breakdown of the 11 customers showed that the ratio of their reported purchases as compared with the sales shown by Duncan’s reconstructed records ranged from .0002% to 34%. A sample, in order to be valid, should bear a reasonable relationship to that of which it is the sample. The same cannot be said of the 11 companies as compared with Duncan’s total sales.
In addition to the fact that the 11 companies do not reasonably reflect a sampling, the result of said use by the Director is a total fuel sales which does not stand the test of reality from the evidence presented. As argued by Duncan, if three pumps were operating continuously for a 24-hour period 20 days a month, and pumping diesel fuel at the rate of 50 gallons every 15 minutes, the total amount of diesel fuel pumped would equal 288.000 gallons. The detailed analysis prepared by the Director’s investigators, on the premise that Duncan underreported sales to others at the same rate that it had underreported sales to the 11 carriers, show that the sales attributed to Duncan in November 1976 and June 1977 exceeded that hypothetical 288.000 gallons. This should also be looked at in light of the undisputed testimony that there was only one man on duty during the 12-hour period commencing at 6:00 p.m. and ending at 6:00 a.m.
Appropriate to the subject case is the language contained in Webb v. Comm., 394 F.2d 366 (5 Cir. 1968), which also involved an absence of records. The court stated:
We recognize that the absence of adequate tax records does not give the Commissioner carte blanche to impose Draconian absolutes.... [at 373]
In accordance with the above, the parties will submit an agreed computation pursuant to R. 8:9-3, whereby the untaxed sales to the 11 carriers will be allocated among the 14 monthly periods under review.