**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



**MARY SIOBHAN BRENNAN**
**JUDGE**

495 Dr. Martin Luther King, Jr. Blvd. Floor 4
Newark, New Jersey 07102
609 815-2922, Ext. 54560
Fax: 609 815-3079

May 10, 2024

Ronald J. Cappuccio, Esq.
Attorney for Plaintiff
1800 Chapel Avenue West, Suite 128
Cherry Hill, NJ 08002

Valerie Ann Hamilton, Esq.
Attorney for Defendant
Deputy Attorney General
Division of Taxation
25 Market Street
PO BOX 106
Trenton, New Jersey 08625-0106

Via ECourts

> RE: **JOYO, LLC V DIRECTOR, DIVISION OF TAXATION**
> **Docket No.: 013001-2019**
> **and**
> **YOJO, LLC V DIRECTOR, DIVISION OF TAXATION**
> **Docket No.: 013002-2019**

Dear Counsellors:

This letter opinion sets forth the court's findings of fact and conclusions of law on plaintiffs'

R. 4:46 motions for summary judgment, and defendant's cross-motions for summary judgment.

I.      Background and Procedural History

Plaintiff JoYo, LLC

Plaintiff JoYo, LLC is a New Jersey single member limited liability company that operates as

a discount liquor store located at 527 Washington Boulevard, Seagirt, New Jersey. Plaintiff's sole






shareholder is Joseph Egan, Jr. ("Egan"). The business is operated as "Egan's Sea Girt Wine and Liquors" and is located in a unit in a commercial strip mall. The plaintiff leases half of this space to a catering company. The business focuses on walk-in sales and does not provide delivery services but occasionally provides alcohol for parties. Egan reports the income and loss from the business on Form 1040 Schedule C of his tax returns

Plaintiff is open for business seven days a week. Sunday hours are 10:00 AM to 8:00 PM throughout the year. Monday through Saturday hours are from 10:00 AM to 9:00 PM in the shore area's off season, and 10:00 AM to 10:00 PM during the summer season.

Plaintiff had two full time employees (including Egan) and between 3 to 5 part-time employees. Additional employees were hired during the summer season as needed. The business had one computerized register. Cash payouts were used for purchases and expenses, including inventory, employee wages, and business expenses.

Defendant, Director Division of Taxation, ("Division') commenced an audit of the plaintiff's sales and use tax liability for the period April 1, 2010 through March 31, 2014 and litter tax liability for the period January 1, 2010 through December 31, 2014. When the audit began, Egan had yet to file NJ-1040 tax returns, including Schedule C, since 2009. During the audit, Egan filed his delinquent NJ-1040 returns, all of which showed a profit. Additionally, plaintiff had not filed litter control fee returns for 2010-2014.

During the pre-audit interview, plaintiff disclosed that it maintained a general ledger, a cash disbursements journal, a purchases journal, a sales journal, detailed register tapes, summary register tapes (Z tapes), deposit slips, NJ-1040 Schedule C's cash receipts journal, depreciation schedule, vendor bills, bank statements, payroll records, and cash payout records. Copies of Egan's filed federal 1040 returns, and plaintiff's cancelled checks and check registers were not retained.

Egan also disclosed that he owned a related business, YoJo, LLC with both businesses maintaining separate liquor licenses.

Plaintiff YoJo, LLC

Plaintiff YoJo, LLC also is a single member New Jersey limited liability company with a discount liquor store located at 515 Warren Avenue, Spring Lake, New Jersey. The business primarily focuses on walk-in sales, however approximately 30 % of its business was also providing delivery services.

Plaintiff YoJo, LLC is open for business seven days a week. Its Sunday hours are 12:00 PM to 8:00 PM in the winter; Monday through Friday hours are from 11:00 AM to 10:00 PM in the shore area's off season, and 10:00 AM to 10:00 PM during the summer season with Sunday's being 11 AM to 8 PM. There were both full time and part time employees as needed.

The shared ownership of both plaintiffs resulted in a shared operational structure and commingling of the various income and expense items associated with the businesses. Most notably, the two businesses shared inventory without records showing the inventory allocated to each store. Egan informed the auditor that he purchased as much as 90% of alcoholic beverage inventory through YoJo, LLC to receive bulk pricing from vendors, and then would transfer some inventory to JoYo, LLC.

Due to the commonality of issues, for purpose of these motions, the related plaintiffs, JoYo, LLC and YoJo, LLC will collectively be referred to as "Taxpayer".

The Audit

Based on the foregoing, the Division decided to simultaneously audit both businesses for years 2010, 2011, 2012, 2013, and 2014.

During the audit, the auditor requested the following:

3

1. Schedule C's for 2009-2014.
2. Tax return worksheets used to prepare the Schedule C's.
3. General ledgers for 2009-2014.
4. Sales journals and register tapes for 2013 (detailed and summary tapes).
5. Cash receipts and cash disbursement records for 2013.
6. Bank statements for 2010-2014, payroll records for 2011-2013.
7. Invoices for purchases and expenses for 2013.
8. Detailed depreciation schedules and paid bills for the audit period.
9. Third party confirmations to support reported cost of goods sold.
10. Purchase invoices for March 2015, selling prices for March 2015.
11. Party books for the 1st quarter of 2013.

In response, Taxpayer provided the following records:

1. NJ-1040 Schedule C's for 2009-2013 (all of which were filed approximately two years after the audit commenced).
2. Tax return worksheets for the Schedule C's.
3. General ledgers for 2009-2012, sales journals for 2013, detailed and summary register tapes for 2013.
4. Incomplete bank statements for 2010-2014.
5. Payroll records for 2011-2013.
6. Invoices for purchases and expenses for 2013.
7. Detailed depreciation schedules and paid bills for the audit period.
8. Invoices and selling prices for March 2015.
9. Party books for the second half of the 1st quarter of 2013.

Taxpayer did not provide the auditor with a NJ-1040 Schedule C for 2014 and the worksheet used to prepare such return, general ledgers for 2013-2014, cash disbursement records for 2013, third party confirmations to support reported costs of goods sold, complete bank statements, or party books for the first half of the 1st quarter of 2013.

Upon review of Taxpayer's records, the auditor deemed Taxpayer's records insufficient and incorrect for three reasons. First, Taxpayer's reported gross receipts as reported on the per ST50s (sales and use tax returns) and Egan's Schedule C reported gross receipts did not reconcile. Second, Taxpayer was unable to reconcile the bank statements to reported receipts. Lastly, Taxpayer's register tapes did not reconcile to reported receipts. Additionally, the auditor's review of the

summary register tapes for the first quarter of 2013 disclosed that there were multiple occasions when the Taxpayer closed out the register with no transactions.

The auditor determined that the Taxpayer's books and records were inadequate to verify the information reported on the sales tax returns, the late filed NJ-1040 returns, and/or litter control fee returns. The auditor also determined that taxpayer had insufficient internal controls.

Consequently, the auditor determined that an indirect method was required to conduct the audit. The auditor reviewed the Taxpayer's purchases using the 2013 calendar year. While the Division states that Egan verbally consented to using 2013, Taxpayer disputes this.

The auditor's examination of third-party liquor purchases confirmed that Taxpayer often purchased inventory under only one business for bulk pricing, and then reallocated inventory between the businesses. In the absence of third party verification, the auditor accepted purchases as reported on the taxpayer's general ledger. After reviewing all of the purchase information, the auditor determined that Taxpayer underreported its purchases only slightly (less than 1% difference). The auditor decided to accept the purchases as reported by Taxpayer.

With the issues of purchases resolved, the auditor moved on to determine the sales subject to taxation. The auditor concluded that due to lack of internal controls and adequate records – especially the exchange of inventory between the businesses without recordkeeping, and the failure to file timely returns, the auditor determined that a markon analysis was necessary. The auditor selected March 2013 as the sample period for the markon because the auditor believed it was representative of the Taxpayer's business, and the Taxpayer was able to provide invoices for that month. While the Division states that Egan verbally consented to using March 2013, Taxpayer disputes this.

The auditor made a list of all the items contained on the Taxpayer's purchase invoices for March 2013, including each items purchase price (from the invoice), grouped by type (beer, wine/liquor, and an "other" category for items such as chips, snacks and candy), and the selling price as provided by Taxpayer. The auditor then compared the purchase price per item to the selling price per item to determine the markon for each item. The auditor compared the total purchase price for all items in each category to the total selling price for all items in that same category. This calculation provided the markon for each category.

The auditor determined a markon for beer of 1.24, a markon for wine and liquor of 1.26 and a markon of other of 1.98. For each category the auditor applied the markon for that category to the purchases per the Taxpayer's records to determine the estimated sales before allowance for each category. The auditor then reduced that number by 5% for non-receipts, which allowed for the recognition that goods are lost due to spoilage, theft, waste, giveaways, discounts, personal usage, etc. The auditor subtracted the allowances for non-receipts, and for coupons from the estimated sales before allowance to determine audited sales. The auditor then totaled the audited net sales for each category and compared it to the audited purchases and determined that there was an overall markon of 1.21 rounded.

Since the two liquor stores shared inventory, the auditor needed to determine the purchases that should be allocated to each business. The auditor did this by comparing the reported gross sales for each store to the total gross sales for each year under audit. The auditor then applied this percentage to the total purchases in each category for each business. Then for each business, the auditor totaled the three categories to determine the total purchases for each business for each year under audit. This led to the auditor's determination of the audited cost of goods sold for each business each year under audit. The auditor then applied the overall markon of 1.21 to each year's

audited costs of goods sold to obtain the audited gross sales for each year. The auditor applied the applicable sales tax rate of 7% to each year's audited gross sales to determine the total sales tax due for each year. The auditor than substrated the Taxpayer's reported sales tax to determine the amount of any additional sales tax due.

The auditor concluded that plaintiff JoYo, LLC owed additional sales tax in the amount of $86,526.04, and additional litter tax in the amount of $1,020.64. For YoJo, LLC the auditor concluded an additional sales tax in the amount of $119,618.62 and additional litter tax in the amount of $407.79.

The Division calculated the applicable interest and penalties on the additional tax due and issued a Notice of Assessment Related to Final Determination to JoYo, LLC on October 13, 2016, in the amount of $120,538.56 and to YoJo, LLC in the amount of $165,220.11.

The Taxpayer filed a protest of its assessment with the Conference and Appeals Branch of the Division of Taxation on January 6, 2017. Taxpayer's basis for the appeal listed the following:

Mark on and percentage is incorrect.
Gross sales calculated is incorrect
Items are included that are non-taxable
End of test year inventory is incorrect
Grocery key with non-tax items are included for full amount in audit
Example items used by auditor do not properly reflect items being sold.
No allotments for breakage, theft or in-store sampling
No allowance for uncollected debt
All bank deposits were based into audit figures. No exemptions for non-sale deposits.
Discounts taken at the register were not taken into consideration when calculating mark-on.

Taxpayer challenged the methodology utilized by the auditors as being incorrect, which presupposes that profit margins applicable in prior years audits would be the same for this audit in determining gross receipts.

7

For the administrative conference, Conferee Victor Jasey asked the Taxpayer to provide the following documents: 2014 Federal and State tax returns, including the Egan's Federal Schedule C; cash disbursement journals for 2013; cash register tapes for the 1st quarter of 2013; 3rd party confirmation letters for 2013 to support the Taxpayer's reported cost of goods sold; appointment party/event calendar books for 2013.

The Taxpayer provided a copy of its 2014 Federal Schedule C; disbursements journal for the period April 2013 through December 2013; cash register tapes for the 1st quarter of 2013; general ledgers for 2013 and 2014 (combining the two businesses); a handwritten journal for the 1st quarter of 2013 summarizing sales; and a handwritten journal for the 1st quarter of 2013 summarizing expenses.

Conferee Jasey reviewed the register tapes from February 17, 2013. There were several receipts found to be missing, and the items listed in the transactions were not included or were difficult for the conferee to determine. The tapes were deemed inadequate. After the audit was completed, Egan filed his 2014 Schedule C returns. Therefore, Conferee Jasey recalculated the sales tax due by adjusting the cost of goods sold to reflect the amounts reported in the Schedule C returns for those years. Conferee Jasey also recalculated the cost of goods sold for each year under audit by including the beginning and ending inventory for each year as reported in its Schedule C returns.

Conferee Jasey reviewed the workpapers and reduced the percentage allowed for nonreceipts (e.g., waste, theft, spoilage) from 5% to 3% to better represent the level of waste for the type of business engaged by the Taxpayer. Conferee Jasey also gave the Taxpayer an allowance for non-taxable sales (e.g., water, exempt organizations) of 2.4% based upon invoices presented. These adjustments reduced the overall sales tax due for JoYo, LLC from $86,526.04 to $82,738.31 and YoJo, LLC from $119,618.62 to $109,239.26.

On June 12, 2019, Conferee Jasey issued the Taxpayer a Final Determination. As to plaintiff JoYo, LLC the Division assessed $138,512.40 in overdue sales and use tax, litter tax, penalties, and interest. As to plaintiff, YoJo, LLC the assessment was $$181,286.18.

The Taxpayer timely filed complaints with the Tax Court of New Jersey on August 30, 2019.

After litigation commenced, Tax Appeal Liaison Ericca Greene reviewed the workpapers prepared by the auditor. Liaison Greene discovered there were some typographical errors in the workpapers. Specifically, in the markon calculation for wine/liquor, the auditor utilized an incorrect number of units of certain liquor available for sale in multipacks. Liaison Greene reviewed the invoices provided by the Taxpayer during discovery in this matter and adjusted the units available for sale to match the invoices. Liaison Greene did this for the following items: J Walker Black, J Walker Red, and Makers Mark 120/12. Liaison Greene recalculated the audited costs of goods sold, including the reported beginning and ending inventory as reported on the taxpayer's filed returns. Liaison Greene also increased the percentage allowance for nonreceipts from the 3% given by Conferee Jasey to the 5% originally allowed by the auditor. This calculation led to an overall markon for the audit period of 1.2140 (1.21 rounded).

Liaison Greene applied this overall markon to the audited cost of goods sold for each year (which now included the beginning and ending inventory reported by the Taxpayer), applied the 7% sales tax rate to each year, and determined that the total sales tax due for the audit period (including adjusting 2010 and 2014 to remove quarters outside of the audit period) totaled $257,071.05 for JoYo, LLC and $407,037.22 for YoJo, LLC. Liaison Greene reduced this amount by the amount of sales tax reported for these periods, and determined additional sales tax is due in the amount of $69,224.52 for JoYo, LLC and $99,804.56 for YoJo, LLC. Liaison Greene calculated the interest and penalty due on this amount, and determined the total sales tax due, with

interest to March 2022, is $137,706.32. for JoYo, LLC and $198,538.31 for YoJo, LLC.  Liaison Greene also recalculated the total litter tax due, based upon the adjusted gross sales calculated. Liaison Greene determined that additional litter tax was due in the amount of $1,933.11 for JoYo, LLC and $668.64 for YoJo, LLC inclusive of penalty and interest.

Taxpayer disputes both the auditor's determination of insufficient records, and the selection of March 2013 as the sample period. Taxpayer argues that there were sufficient records for a full audit, that liquor stores in New Jersey rely on quantity purchasing for profit, that there is a seasonal component to be factored into liquor stores located in New Jersey shore towns, and that business interruption from Superstorm Sandy[1] also had to be factored into the audit.

Taxpayer offers as evidence against the markon audit, the fact that a subsequent audit conducted by the Division for later years did not result in the use of a sample period and markon audit. With the support of a certification from Taxpayer's expert CPA, Taxpayer claims that the same type of accounting documents deemed insufficient for the 2010-2014 audit, were sufficient for an actual audit analysis for the audit period 2015-2018. Those documents are listed as Schedule C, business tax returns, general ledgers, cash receipt and cash disbursement books, bank statements, sales book, cash register tapes, purchase books, third party confirmation letters, and party books.

---

[1] On October 29, 2012 the center of 900-mile-wide Superstorm Sandy made landfall in New Jersey near Brigantine. The massive storm and its accompanying 80 mph sustained wind, heavy rains, and a record-breaking storm surge that coincided with a high tide and a full moon caused massive destruction many New Jersey communities and most significantly in New Jersey's shore communities. Streets were flooded, houses and buildings swept off their foundations, and trees and powerlines toppled. Recovery took years.

An exception to the above was for Schedule C's and tax return information for 2014. Taxpayer was not able to provide those documents when requested in 2014 because Egan's tax returns had yet to be completed and filed.

Regarding the bank statements, Taxpayer combined the sales receipts from both liquor stores when making bank deposits. Taxpayer asserts that this was for convenience only, however the auditor failed to acknowledge this and combine the bank statements of both stores.

II.     Legal Analysis

Rule 4:46-1 allows a party to move for summary judgment before the case is tried. The court may grant the motion if, from the pleadings, depositions, answers, admissions, and/or certifications, it appears that there is "no genuine issue as to any material fact challenged." R. 4:46-2. Summary Judgment shall be granted where "there is no genuine issue as to any material fact . . . and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "The key inquiry is whether the evidence presented, when viewed in the light most favorable to the non-moving party, is 'sufficient to permit a rational factfinder to resolve the alleged dispute in favor of the non-moving party.'" T.B. v. Novia, 472 N.J. Super. 80, 93 (App. Div. 2022) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

The movant bears the "burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact" regarding the claims asserted. Judson v. Peoples Bank and Trust, 17 N.J. 67, 74 (1954) (citation omitted). The Supreme Court has cautioned that, "a court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995) (emphasis in original; quoting R. 4:46-2(c)). "That means a non-moving party cannot defeat a motion for summary judgment merely by pointing to

11

any fact in dispute." Ibid. (emphasis in original). Moreover, "when the evidence is so one sided that one party must prevail as a matter of law the trial court should not hesitate to grant summary judgment." Id. at 540 (quotations omitted).

This case brings into question whether the Defendant's auditor properly conducted a mark-up analysis for the tax year in question, or if a mark-up analysis should have been conducted at all. "In general terms, markup methodology is used when the Director's auditor deems the records of a taxpayer, whose receipts are primarily in cash, are insufficient to verify the gross receipts as reported on the taxpayer's sakes tax returns and income tax returns." Yilmaz, Inc. v. Dir., Div. of Tax'n, 22 N.J. Tax 204, 212 (Tax 2005). During the markup the auditor compares the taxpayer's cost of the goods sold to the selling prices of those goods. Ibid. The costs of the good sold are calculated by the invoices and records by the suppliers, white the selling price is calculated by the taxpayer's menu or other documents indicating price. Ibid. From these two numbers the auditor creates a ratio of selling price to cost, or "markup," which is developed from a smaller sample period that is then applied to the taxpayer's entire audited year. Ibid.

The two-issues presented to this court are: (1) whether Plaintiff can cite a subsequent audit as evidence that the auditor's decision to do a mark-up analysis in the first audit was improper; and (2) if the subsequent audit cannot be admitted as evidence, whether the mark-on analysis of the first audit was improper based on facts of the case.

The general legal principles applicable to a claim involving a challenge to the audit methodology used by the Division due to inadequate books and records are well settled. One is that a taxpayer is required to keep sufficient books and records for the Division to determine proper tax liabilities. A second is that a presumption of correctness attaches to the Division's assessment of tax.

Pursuant to statute, a taxpayer must keep sufficient books and records in order for the Division to determine proper sales tax liabilities. N.J.S.A. 54:32B-16; N.J.A.C. 18:24-2.3, -2.4. As further set forth in the regulations, a taxpayer must make available to the Division "[a] true copy of all sales slips, invoices, receipts, statements, memoranda of price, or cash register tapes, issued to any customer . . . and records of every purchase," which must be retained "for four years from the date of filing of each quarterly sales tax return." N.J.A.C. 18:24-2.3(a).

For tax periods prior to the regulation change in 2016, if summary records are maintained that "show . . . total receipts and taxable receipts," during the tax years under appeal, a taxpayer could "dispose of individual sales slips, invoices, receipts, statements, memoranda of price, or cash register tapes . . . after the lapse of a period not less than 90 days from the last date of the most recent quarterly (or monthly) period for the filing of sales tax returns to which such individual sales documents pertained." N.J.A.C. 18:24-2.4(a); see also 47 N.J.R. 2919(a) (Dec. 7, 2015); 48 N.J.R. 824(a) (May 16, 2016) (amending regulation to eliminate ninety-day exception for individual records and imposing four-year retention period).

If the taxpayer has failed to keep the required books and records, or if the books and records maintained do not clearly reflect income, the Division has broad authority to reconstruct income "by using any information available, whether from the vendor's place of business or from any other source." See N.J.S.A. 54:32B-19; Yilmaz, 22 N.J. Tax at 231, 235; Alpha I, 19 N.J. Tax at 57; L.B.D. Const., Inc. v. Dir., Div. of Taxation, 8 N.J. Tax 338 (Tax 1986); Ridolfi, t/a Hub Bar v. Dir., Div. of Taxation, 1 N.J. Tax 198 (Tax 1980).

As stated in Saulwil, Inc. v. Dir., Div. of Taxation, 31 N.J. Tax 433 (Tax 2020):

> Clearly, then, under the statute and precedent, Taxation can reconstruct a taxpayer's receipts subject to tax and determine the correct tax if the taxpayer's books and records are inadequate or there are justifiable reasons to believe that a filed tax return "is

incorrect or insufficient." Thus, Taxation's audit determinations are not set in stone. Rather, they are presumptively correct, which means that a taxpayer can rebut the same with proof of "bona fide business records" that are qualitatively and quantitatively credible. Duncan Truck Stop, Inc. v. Dir., Div. of Taxation, 4 N.J. Tax 367, 375-76 (Tax 1982).

The term "inadequate" is not defined anywhere. Nonetheless the broad discretion allowed Taxation under N.J.S.A. 54:32B-19, and the presumptive correctness afforded its determinations, are based on the expectation that Taxation, as a governmental agency, will be reasonable in its initial determination that a taxpayer's books and records are inadequate. See e.g. S. Burlington County NAACP v. Township of Mount Laurel, 92 N.J. 158, 305, (1983) (presumption of correctness to government decisions attaches because "those in government generally act within the powers granted to them and do so properly"); Borough of Rumson v. Peckham, 7 N.J. Tax 539, 548 (Tax 1985) ("Nonstatutory presumptions such as, inter alia, the presumption of correctness of a county board of taxation judgment, are based on considerations of public policy").

Additionally, the square corners doctrine impacts Taxation's determinations, and thus, balances with the presumption of correctness provided to those determinations. See Milligan v. Dir., Div. of Taxation, 29 N.J. Tax 381, 398-99 (Tax 2016) ("the square corners doctrine is a long-established legal principle limiting Executive Branch action which would otherwise be authorized by law"). Thus, the government cannot "conduct itself so as to achieve or  preserve any kind of bargaining or litigational advantage over" a taxpayer since "[i]ts primary obligation is to comport itself with compunction and integrity"; therefore, it cannot act like "private citizens . . . in dealing with one another"). F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426-27, 495 A.2d 1313 (1983). As the Court pointed out:

> [S]tatutory provisions governing substantive standards and procedures for taxation, including the administrative review process, are premised on the concept that government will act scrupulously, correctly, efficiently, and honestly. It is to be assumed that the [taxing agency] will exercise its governmental responsibilities in the field of taxation conscientiously, in good faith and without ulterior motives.
>
> [Id. at 427].

Consequently, while this court can decide, based on evidence properly before it, whether a taxpayer has overcome the presumptive correctness of an audit determination, such evidence can also be examined to decide whether Taxation's initial conclusion as to the inadequacy of books and records was reasonable. Thus, a taxpayer can provide credible evidence (documentary and/or testimonial) to show that Taxation's reasons for performing a markup were unreasonable, and further that the consequent audited tax assessments were arbitrary and aberrant. See TAS Lakewood v. Dir., Div. of Taxation, 19 N.J. Tax 131, 139-41 (Tax 2000) (court's "review [of] the audit figures" allowed it to "conclude that the tax deficiency imposed based on the only available records, the tax returns . . . [was] reasonable and justified by law"); Yilmaz, 390 N.J. Super. at 441-42, (taxpayer can present "competent independent evidence, expert or otherwise, to challenge that presented by" Taxation to prove either an aberrant methodology or excessive assessment amount, or provide evidence through cross-examination of the auditor that Taxation's assessment is incorrect); United States v. Carson, 560 F.2d 693, 698 (5th Cir. 1977) (government reliance on simply a presumption of correctness untenable since it "would support the most arbitrary of assessments so long as the taxpayer found himself unable to prove a negative"); Walker v. Commissioner, 757 F.2d 36, 37 (3d Cir. 1985) ("In unreported income cases, the presumption of correctness imposes on the taxpayer the difficult burden of proving a negative, that he did not earn the income the government claims he earned" and while this is often "from the taxpayer's own failure to keep business records of transactions known only to him," yet these "record keeping failures do not justify" an unreasonable or "naked assessment").

Whether a taxpayer's records are "inadequate" depends on the facts and circumstances of each case. It is not necessarily the quantity of records, but also the quality. That a taxpayer does not maintain, or cannot produce, each and every record demanded by Taxation is not a conclusive indication of inadequacy in record-keeping. A taxpayer need not maintain the best or perfect records. Rather, its records should be sufficiently enough to support the veracity of its filed returns. A contrary construction would render meaningless the discretion afforded Taxation in examining books and records, and the presumptive correctness afforded its determinations.


[Saulwil at 447-449]

Subsequent audits are generally irrelevant as "[e]ach audit period stands on its own, and a taxpayer cannot establish that an earlier audit was erroneous by contending that a later audit was correct." Yilmaz, 22 N.J. Tax 204, 226. However, in Yilmaz the court established certain requirements a taxpayer would need to satisfy to introduce a subsequent audit as evidence. First, the taxpayer would need to prove the reliability of the records of the subsequent audit. Ibid. The court explained that "the reliability of the findings of the subsequent audit could be determined only after evidence was presented as the reliability of the records maintained by the taxpayer during the later period as well as the methodology employed by the Division." Id. at 227. In Yilmaz, the taxpayer only submitted workpapers from the subsequent audit which the court emphasized was "not a final audit determination." Id. at 226. The period covered by the subsequent audit was "unknown" and the methodology of the auditor was not clear. Ibid. However, the court stated that even when a "complete and final set of work papers" are offered the taxpayer must still prove the reliability of the records maintained by the taxpayer during the later period as well as the methodology employed by the division. Id. at 227. Plaintiff claims to have submitted the subsequent audit's final audit determination as part of it proofs but no such document has been submitted. Plaintiff also asserts the final audit determination was based on all books and records covered the audited entire period. Even if Plaintiff submitted the final determination what arises is a material fact that is not proper for summary judgment.

Second, even if the court were to find that Taxpayer has established that the subsequent audit is reliable, Taxpayer would then still need to prove the subsequent audit is relevant to the reasonableness of the audit at issue. "Only relevant evidence is admissible." Ibid. In Yilmaz the subsequent audit had "no bearing" on whether the audit at issue was conducted reasonably as

16

"[n]othing about the documents proffered by the plaintiff would have any tendency to prove anything about the audit at issue here." Ibid.

Here, the relevance of the subsequent audit to the case at bar is whether the documents used in both audits are "substantially similar" or "virtually identical" as Taxpayer contends. The specific records the Division requested in both audits were: (a) Schedule C; Business Tax Returns; and Tax Return Worksheets; (b) General Ledgers; (c) Cash Receipts and Cash Disbursement Books and Records; (d) Bank Statements; and (e) Party Books. Taxpayer contends that these types of records were submitted in both the 2013 and 2020 audits making them substantially similar.

The Division contends a 2014 Schedule C and Tax Return Worksheet was never received. Taxpayer claims the request for documents for the year 2014 was improper because tax filing for the year 2014 was not due yet. The Division's auditor indicated that he never received Taxpayer's 2013 General Ledger. Taxpayer disputes this and claims the 2013 General Ledger was provided. These are all factual determinations that cannot be resolved without a hearing and credibility determinations.

Taxpayer also argues that the audit's mark-up analysis was flawed irrespective of the subsequent audit. An audit's presumption of correctness "can be rebutted only by cogent evidence that must be 'definite, positive and certain in quality and quantity to overcome the presumption.'" Yilmaz, 22 N.J. Tax 204, 236 (citing Pantasote Co. v. Passaic, 100 N.J. 408, 413 (1985)). Such evidence must "focus on the reasonableness of the underlying data" used by the auditor as well as the auditor's methodology for "aberrant methodology will overcome the presumption of correctness… imperfect methodology will not." Id. at 236.

Taxpayer asserts that the markon methodology was improper due to the auditor's decision to use March 2013 as the sample period, emphasizing that since the liquor stores are in New Jersey

shore communities they have a primary season of May through September. Taxpayer argues that in March of 2013 shore town businesses were impacted by Superstorm Sandy making the sample period inaccurate and flawed.

Taxpayer also argues that the discrepancies in gross receipts are because of non-taxable income received from alcohol distributors. Specifically, Taxpayer claims that it received Refunds on Purchases ("RIPS") from alcohol distributors due to bulk purchasing of certain liquor items. Taxpayer posits that the RIPS income is not taxable as it does not relate to sales. Taxpayer's bank statements allegedly contain these RIPS deposits, and they account, at least in part, to the discrepancy between gross receipts and taxable income.

These disputes directly relate to the determination of the adequacy of Taxpayer's documents and to the methodology of the auditor, and consequently give rise to issues of material fact. This court finds that neither Taxpayer nor the Division has overcome its burden on summary judgment. Without a full record and fact findings by the court, the issues presented by both parties cannot be reconciled as a matter of law.

III.     Conclusion

The court denies Taxpayers' motions for summary judgment and the Division's cross-motions for summary judgment as there are issues of material fact that cannot be ruled on as a matter of law. Furthermore, in accordance with the court's directive on the record, the court has scheduled a preliminary hearing on Tuesday August 13, 2024, at 9:00 a.m. for the sole purpose of determining whether Taxation's initial conclusion as to the inadequacy of books and records was reasonable.

/s/ Mary Siobhan Brennan
Hon. Mary Siobhan Brennan, J.T.C.